**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James Glenn MOORE,
Defendant–Appellant.**

**No. 90–8337.**

United States Court of Appeals,
Fifth Circuit.

March 20, 1991.

* Judge Johnson is recused, and therefore did not participate in this decision.

Greg White, Waco, Tex., (Court-appointed) for defendant-appellant.

Mark R. Stelmach, LeRoy M. Jahn, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Defendant James Moore pled guilty to amphetamine distribution. In sentencing the defendant, the district court took into account the 2.29 grams of amphetamine Moore sold to undercover officers, the 28.-35 grams of amphetamine he negotiated for future sale, and the 860.05 grams of amphetamine confiscated by police at his home five months prior to the sale mentioned in his indictment. We hold that the district court properly considered the amphetamine confiscated in Moore's prior arrest and the drugs then being negotiated.

I.

On January 7, 1989, police officers searched the residence of James Glenn Moore (Moore) and his wife, Sarita Moore. Although Moore was not present during the search, the officers found laboratory equipment, glassware, precursor chemicals, and controlled substances needed to manufacture methamphetamine. They also found approximately 66.25 grams of relatively pure amphetamine, 793.80 grams of 2% pure amphetamine, and two stolen firearms.

Mrs. Moore voluntarily stated to the police that her husband was involved in an amphetamine production laboratory operation with Bruce Gentry—described as "the Cook"—and Danny Ray Leverett. The operation involved Gentry's dividing the controlled substance manufactured at the Moore's home among himself, Leverett and Moore. Although Mrs. Moore identified the controlled substance found in her bedroom closet as a product of the last "cooking" process, she asserted that she and her husband already had sold their portion of the drug. Leverett confirmed that Moore was involved in the manufacture of amphetamine and that Moore had received his share of the drugs.

Moore subsequently was charged in state court with the aggravated manufacture of a controlled substance. Shortly after his release on bond, he was arrested on unrelated and still pending charges for the possession of marihuana.

After Moore's release on the possession charges, a confidential informant told law enforcement officers that Moore was a possible drug dealer. The informant indicated that the officers could purchase an "eight ball," or one-eighth ounce of amphetamine, from Moore for $225. As requested by the informant, the officers drove to Moore's home to purchase the drugs, but Moore was not home.

The informant then advised the undercover officers to meet the defendant the next day, June 15, 1989. Meeting in Moore's pickup truck, the two officers purchased a plastic bag containing an "eight ball" from Moore for $200. The officers told Moore that they wished to buy larger quantities of amphetamine, and Moore said that he could undertake more amphetamine transactions in the near future. He told one of the officers that he would have a full ounce of the same quality for $950 "in a day or so."

The officers tested the purchased bag and verified that it contained 2.29 grams of amphetamine. This transaction was the subject of the indictment in the instant case. A second search of Moore's home in October 1989 resulted in the discovery of additional chemical glassware coated with amphetamine residue.

Moore was charged with distribution of amphetamine in violation of 21 U.S.C. § 841(a)(1) (1988). Moore pled guilty and agreed to cooperate fully. In return, the government agreed to refrain from prosecuting Moore for his other title 21 violations and to inform the court of Moore's cooperation.

The district court accepted the plea. Prior to agreeing to the presentence investigation report (PSI), Moore indicated that he wished to reconsider his guilty plea because he felt the PSI took account of too

high a quantity of drugs in evaluating his base offense level. After a continuance, Moore then decided that he did not desire to withdraw his plea.

After hearing objections to the PSI at the sentencing hearing, the court refused to exclude, as relevant conduct, the amphetamine seized previously. Initially the court, in accordance with the PSI, calculated Moore's base offense level at 26, resulting in a sentencing range of 70–87 months' confinement. The court decided, however, to grant Moore a two-level reduction in the offense level for his willingness to cooperate and because of the low level of purity of one batch of the seized drugs. Moore thus received an offense level of 24 and was sentenced to 57 months, at the lowest end of the suggested guideline range of 57–71 months.[1]

## II.

Moore argues that the 860 grams of amphetamine found during the initial search of his home was not relevant, under the sentencing guidelines, to his later crime of distribution of amphetamine. While he admits that the guidelines allow courts to consider quantities of drugs not directly related to a current conviction, he believes that such amounts may be considered only if they were involved in incidents directly related in time and manner to the case at issue. Moore contends that the five months that elapsed between the two incidents forecloses the district court from considering the earlier evidence.

Moore also maintains that the two incidents were qualitatively different, also foreclosing the district court from amalgamating the two. Moore argues that the June sale of drugs could not have come from the same batch of drugs, because the drugs found in the January search of his home long before were sold and/or seized, and that the drugs he sold to the undercover officer thus were "several 'cooks' removed from the 860.05 grams." Moore thus contends that his base offense level should be determined only on the basis of the 2.29 grams he sold to the undercover officer in June, and not on the 890.69 grams that the court in fact used.[2]

■ Section 1B1.3 of the guidelines "allows for the consideration of 'relevant conduct' in determining the base offense level to be applied to a particular case." *United States v. Woolford*, 896 F.2d 99, 103 (5th Cir.1990). In drug distribution cases, "the base offense level can reflect quantities of drugs not specified in the count of conviction if they 'were part of the same course of conduct or part of a common scheme or plan as the count of conviction.' " *United States v. Mir*, 919 F.2d 940, 943 (5th Cir. 1990) (quoting *United States v. Taplette*, 872 F.2d 101, 105 (5th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 128, 107 L.Ed.2d 88 (1989)); *see* U.S.S.G. § 1B1.3. To be considered as relevant conduct, drug-related offenses need not result in the defendant's conviction. *United States v. Byrd*, 898 F.2d 450, 452 (5th Cir.1990) (per curiam); *Taplette*, 872 F.2d at 106.

■ The district court correctly considered the drugs involved in Moore's still-executory contract with the undercover officers and the amount found in the earlier search of his home. We already have held that a court properly may consider the amounts of drugs still under negotiation in an uncompleted distribution when calculating relevant conduct. *United States v. Sarasti*, 869 F.2d 805, 806 (5th Cir.1989); *see* U.S.S.G. § 2D1.4, application note 1. The court thus did not err by considering the 28.35 grams of amphetamine that Moore had not yet sold to the undercover officers.

■ The district court also properly counted, when establishing Moore's offense level, the 860.05 grams of amphetamine found earlier at his home. The similar nature of the drugs found in the earlier search, the ongoing negotiations for additional amphetamine Moore was willing to supply to the officers, and the testimony of

---

1. Moore also was sentenced to five years of supervised release, a $5,000 fine, and a special assessment.

2. On appeal, Moore does not mention the 28.35 grams of amphetamine he was negotiating to sell to the undercover officers, which the court also included in his base offense level.

Mrs. Moore all demonstrate that Moore was engaged in a continuing amphetamine manufacture and distribution enterprise.

Furthermore, Moore's intervening arrest for marihuana possession between the two events shows his continuing involvement with drugs. Considering that Moore had promised to bring the undercover officers a large quantity of drugs in the future, it is most likely that he intended to use his home equipment to manufacture the promised amphetamine, as the laboratory glassware found in his home during the second search indicates that he still had the potential for manufacturing additional amphetamine. We thus conclude that there was sufficient identity between the evidence in the two events to make the district court's consideration of the earlier search proper.

Moore would have us close our eyes to the ongoing nature of his criminal amphetamine enterprise. The evidence shows that Moore's entrepreneurial activities were continuous in nature. Considering that Moore was involved in both the manufacture and distribution of amphetamine, his arbitrary attempt to divide his role into discrete segments is baseless. A person who both manufactures and distributes the same drugs cannot seriously contend that one activity is so separate from the other as to foreclose consideration of them both during sentencing.

The three events also were not so far apart as to require the district court to consider them to be unrelated, as Moore maintains. Moore cites no cases to support his theory of temporal restriction. We already have held in Mir that drug-related incidents occurring approximately seven months apart can be used to prove a common scheme or plan. Because the sole limitation in the guidelines is that the conduct be "relevant," we reject Moore's suggestion that his earlier conduct be placed off-limits simply because of a lapse of time. See United States v. Santiago, 906 F.2d 867, 872–73 (2d Cir.1990) (drug transactions eight months apart were part of same course of conduct because there is no "inherent limitations on the transactions to be considered"). There is no separate statute of limitations beyond which relevant conduct suddenly becomes irrelevant.

As we recently stated in a related area, in evaluating criminal conduct under the guidelines a district court is not required deliberately to don blinders designed to obscure a defendant's crime from the light of common sense. Mir, 919 F.2d at 944. The guidelines do not require courts to ignore the manufacturing activities of a drug dealer simply because they occurred earlier or because the indictment solely mentions drug distribution, and we do not read that requirement into the guidelines today. The district court thus acted well within its discretion when it included the results of the earlier search in its calculation of Moore's offense level.

The guidelines impose no temporal restrictions on validly-obtained, relevant evidence, and they allow district courts to consider the manufacturing activities of a drug distributor. We thus AFFIRM the judgment of the district court.