# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 29, 2009

Charles R. Fulbruge III
Clerk

No. 08-10502

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

CURTIS ONEAL RHINE

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before WIENER, GARZA, and ELROD, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Curtis Oneal Rhine was convicted, based on his plea of guilty without a plea agreement, on one count of possession with intent to distribute 1.89 grams of cocaine base and one count of felon in possession of a firearm. Rhine now appeals his sentence, contending that the district court clearly erred when it determined that his earlier drug-related activity was relevant conduct for sentencing purposes. Convinced that Rhine's earlier conduct cannot properly be considered relevant conduct for his sentencing on the offense of conviction, we reverse and remand for re-sentencing.

## I. FACTS AND PROCEEDINGS

### A.    The Offense of Conviction

Late in October 2007, a Fort Worth police officer conducted a routine traffic stop of a vehicle in which Rhine was occupying the front passenger seat. There were two other individuals in the vehicle at the time of the stop: Algie Deon Moore, the driver, and Lavell Buchanan, a female passenger seated in the rear.   When the officer smelled marijuana in the vehicle, he asked Rhine whether he had been smoking.   When Rhine replied that he had smoked marijuana earlier that evening, the officer asked him to step out of the vehicle.

After a background check revealed that Rhine had several outstanding warrants for his arrest, the officer took him into custody and conducted a search of the vehicle, discovering two firearms under the passenger seat where Rhine, a convicted felon, had been seated.  The officer then took both Rhine and Moore — also a convicted felon — to the Fort Worth city jail, where an intake search revealed a small plastic bag containing 1.89 grams of cocaine base (crack cocaine) concealed in Rhine's anal cavity.[1]

The grand jury returned a two-count indictment charging Rhine with (1) possession with intent to distribute 1.89 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) ("Count 1"), and (2) possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(1), and (a)(2) ("Count 2"). Rhine pleaded guilty to both counts without a plea agreement.[2]

### B.    The "Fish Bowl" Drug-Trafficking Ring

In May 2006 — approximately 17 months before Rhine's arrest for the instant drug offense — an ongoing FBI investigation known as the "Fish Bowl"

---

[1] The officer released the other passenger, Lavell Buchanan, at the scene without charging her.

[2] Moore, who was only charged in Count 2 of the indictment, also pleaded guilty without a plea agreement.  He is not a party to this appeal.

investigation culminated in a large-scale drug raid in Fort Worth, Texas. The raid resulted in the indictments of more than 30 individuals for a variety of criminal offenses, most of which involved drug trafficking.[3]  After conducting post-arrest interviews with many of the individuals apprehended during the raid, FBI Special Agent J. Coffindaffer ("SA Coffindaffer") reported that several individuals had implicated Rhine in the criminal drug activity.[4]  As agents were unsuccessful in completing a controlled drug buy from Rhine, he was not charged along with the other Fish Bowl participants.

After Rhine's arrest in the instant case, SA Coffindaffer reinitiated his investigation into Rhine's participation in the Fish Bowl drug-trafficking ring. SA Coffindaffer first interviewed Rhine, who stated that he had moved into his mother's house several months after the Fish Bowl arrests to "lay low" and to avoid getting in trouble.  Rhine said that he had been unemployed since his release from state prison in 2005, yet was unable to explain how he had supported himself, his children, or his drug habit during that time.[5]  Rhine further claimed that he had not sold any narcotics or possessed any guns since his 2005 release.  According to Rhine, the guns found during the search of the vehicle had belonged to Moore, even though Rhine acknowledged that his fingerprints might be found on one of the firearms because he had loaded it.

---

[3] The term "Fish Bowl" refers to a small neighborhood about three miles southeast of downtown Fort Worth, bordering the western edge of Cobb Park.  According to police, a street gang controlled the neighborhood by keeping the only two entrances surrounded by lookouts, making it difficult for police to conduct a surprise raid.

[4] In these statements, the individuals assisting in the investigation commonly refer to Rhine only by his street name — "Pushead," or "Pus Head."  One individual, however, stated that he had purchased three to four kilograms of crack cocaine from someone he knew only as "Pumpkin Head."  As there was no other mention of a "Pumpkin Head" in connection with the investigation, SA Coffindaffer assumed that this individual was referring to Rhine.

[5] Although Rhine stated that he had been released from prison on parole in 2005, records from the Texas Department of Criminal Justice indicate that he was in fact released on October 11, 2004.

Rhine also stated that both he and Moore had first met Buchanan, a crack-cocaine user, when they picked her up from a service station shortly before their arrest.

After interviewing Rhine, SA Coffindaffer conducted a series of follow-up interviews with the individuals who had initially implicated Rhine in the Fish Bowl drug-trafficking ring, questioning them about their experiences with Rhine before the Fish Bowl raid and their ensuing arrests. One informant indicated that he had purchased approximately 15 grams of cocaine base from Rhine on a single occasion; another indicated that he had received approximately 62 grams of cocaine base from Rhine every week for almost three months; and a third indicated that he had regularly cooked between five and six kilograms of powder cocaine into crack cocaine for Rhine over a period of several months. According to these informants, Rhine was one of the primary, large-scale suppliers of crack cocaine to the mid-level Fish Bowl dealers prior to the FBI raid.

SA Coffindaffer also interviewed Lavell Buchanan, the passenger seated in the back of Moore's vehicle at the time of Rhine's arrest. Buchanan stated that she had initially walked to a service station to purchase beer but decided to purchase crack cocaine instead when she learned that Rhine and Moore were selling it from a dark-colored van in the parking lot. According to Buchanan, she did not know either Rhine or Moore before that meeting, during which she had agreed to purchase five dollars of crack cocaine from them. Buchanan stated that she, Rhine, and Moore were driving to her apartment to complete the transaction when police stopped them.

## C.   The Pre-Sentence Report

After reviewing the entire record and the statements made to SA Coffindaffer, the probation officer who compiled the Pre-Sentence Report ("PSR") concluded that Rhine's earlier drug-related activities were relevant conduct for

sentencing purposes. Specifically, the probation officer deduced that Rhine's alleged participation in the Fish Bowl drug-trafficking ring was "all part of the same course of conduct or common scheme [or] plan as the offense of conviction."

To determine the total amount of drugs involved in this relevant conduct, the probation officer credited the testimony of the informant who had stated that he had regularly cooked between five and six kilograms of powder cocaine into crack cocaine for Rhine over a period of several months. Basing her calculations on this information, the probation officer concluded that Rhine had possessed at least 4.5 kilograms of crack cocaine during the course of his alleged participation in the Fish Bowl drug-trafficking operations — a figure that, according to the probation officer, represented a "very conservative estimate" that she made to avoid double-counting drug amounts.

Pursuant to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") Section 2D1.1, the probation officer calculated Rhine's Base Offense Level to be 38. Factoring in Rhine's acceptance of responsibility, his criminal history record, and his possession of a firearm during commission of the offense, the probation officer determined that Rhine's Total Offense Level was 37 with a Criminal History Category of IV, producing a Guidelines range of 292 to 365 months imprisonment.[6] The Guidelines called for Rhine's sentences on Counts 1 and 2 to be imposed consecutively, but only to the extent necessary to produce a combined sentence equal to his total maximum punishment.[7]

---

[6] Although the Guidelines indicated a sentencing range of up to 365 months, the maximum sentence for Count 1 is limited by statute to 240 months and the maximum sentence for Count 2 is limited to 120 months, thus providing for a maximum statutory sentence of no more than 360 months if imposed to run consecutively.

[7] U.S.S.G. § 5G1.2(d) (2007) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.").

Rhine timely filed an objection to the PSR. His primary objection was to the conclusion that his alleged participation in the Fish Bowl drug-trafficking ring was relevant conduct for sentencing on his offense of conviction. Rhine insisted that any participation in the Fish Bowl incident was neither part of a common scheme or plan nor part of the same course of conduct as the instant behavior. Rhine contended that the activities not only lacked common accomplices, common victims, a common purpose, or a common *modus operandi*, but also showed no evidence of temporal proximity, similarity, or regularity. Rhine also objected to the PSR's consideration of facts that were neither admitted by him nor found beyond a reasonable doubt by a jury, contending that the court would violate his Sixth Amendment rights by increasing his sentence based on such information.

In response to Rhine's objections, the probation officer filed an Addendum to the PSR, in which she declined to credit the objections or amend her Guidelines calculations. Insisting that Rhine's earlier drug-related activities were relevant conduct, the probation officer voiced the opinion that Rhine "has participated in drug-related activities since at least 1993." In particular, the probation officer cited Rhine's three pre-Fish Bowl convictions for drug-related crimes, noting that (1) in 1993, Rhine pleaded guilty to possession of crack cocaine with intent to deliver, (2) in 1999, he pleaded guilty to possession of marijuana, and (3) in 2002, he pleaded guilty to possession of a controlled substance.[8] Despite having no direct evidence that Rhine had engaged in any criminal activity — much less drug activity — between May 2006 and October 2007, the probation officer nevertheless found persuasive the *absence* of "evidence that [he] completely removed himself from that type of lifestyle."

---

[8] In addition, Rhine was also arrested twice in connection with other drug-related offenses, although these arrests did not lead to convictions: (1) In 1993, he was arrested for possession of crack cocaine; and (2) in 1998, he was arrested for possession of marijuana.

According to the probation officer, Rhine likely would have been distributing a large volume of drugs over that period if not for "the fact that most of the larger scale dealers had already been arrested for, and convicted of, federal drug violations." Declining to credit Rhine's move into his mother's house to "lay low" as a voluntary departure from crime, the probation officer instead surmised that Rhine had silently harbored intentions to "resume his drug trafficking activities." The probation officer concluded that Rhine's participation in the Fish Bowl drug-trafficking ring and his offense of conviction were all part of the same course of conduct or common scheme or plan.

Rhine timely objected to the Addendum, again asserting that his alleged participation in the Fish Bowl drug-trafficking ring was not relevant conduct for purposes of sentencing on the offense of conviction.

## D. Sentencing

The district court adopted the findings of the PSR and the Addendum, overruling Rhine's objections to both. The court said that "all of the transactions that were taken into account by the probation officer were sufficiently connected or related to each other to warrant the conclusion that they were a part of a single episode or spree or ongoing series of offenses." Despite the absence of any record evidence, either direct or circumstantial, that Rhine had dealt drugs since the end of the Fish Bowl operations, the government stated on the record that there was no indication that Rhine had stopped selling drugs in the period between the Fish Bowl arrests and his offense of conviction. The court explained that it had taken this into consideration in making its relevant-conduct determination. The court then overruled Rhine's other objections, including his contention that the Sixth Amendment prevented the court from increasing his sentencing range based on facts that were neither admitted by him nor found by a jury.

Adopting the Guidelines calculations set forth in the PSR, the district court sentenced Rhine to the statutory maximum period of imprisonment — 240 months as to Count 1 and 120 months as to Count 2, to run consecutively.

Rhine timely appealed his sentence. He now urges that (1) the district court committed clear error by characterizing his earlier drug-related activities as relevant conduct for sentencing purposes, and (2) even if those activities were relevant conduct, the court violated his Sixth Amendment rights by increasing his sentence based on facts neither admitted by Rhine nor proved beyond a reasonable doubt to a jury.

## II. ANALYSIS

### A. Standard of Review

A district court's interpretation and application of the Guidelines is reviewed *de novo* and its factual determinations are reviewed for clear error.[9] "A finding by the district court that unadjudicated conduct is part of the same course of conduct or common scheme or plan is a factual determination subject to review . . . under the clearly erroneous standard."[10] "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole."[11]

### B. Relevant Conduct

A defendant convicted of a drug offense is sentenced based on the amount of drugs involved in the offense.[12] In calculating a defendant's base offense level,

---

[9] *United States v. Peterson*, 101 F.3d 375, 384 (5th Cir. 1996).

[10] *United States v. Hinojosa*, 484 F.3d 337, 340 (5th Cir. 2007) (internal quotation marks and citation omitted); *see United States v. Wall*, 180 F.3d 641, 644 (5th Cir. 1999) ("A district court's determination of what constitutes relevant conduct for purposes of sentencing is reviewed for clear error."); *United States v. Bryant*, 991 F.2d 171, 177 (5th Cir. 1993) ("[S]pecific factual findings regarding relevant conduct are reviewed on appeal only for clear error.").

[11] *United States v. Sanders*, 942 F.2d 894, 897 (5th Cir. 1991).

[12] U.S.S.G. § 2D1.1.

the district court may consider other offenses in addition to the acts underlying the offense of conviction, as long as those offenses constitute "relevant conduct" as defined in the Guidelines. As we have recognized, "the base offense level can reflect quantities of drugs not specified in the count of conviction if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction."[13] The defendant need not have been convicted of, or even charged with, the other offenses for them to be considered relevant conduct for sentencing purposes.[14] In drug distribution cases, we have "broadly defined what constitutes the 'same course of conduct' or 'common scheme or plan.'"[15] With this in mind, we now address whether Rhine's alleged participation in the Fish Bowl drug-trafficking ring and his offense of conviction are part of (1) a common scheme or plan, or (2) the same course of conduct.

### 1. Common Scheme or Plan

A separate, unadjudicated offense may be part of a common scheme or plan — and thus relevant conduct — if it is "substantially connected to [the offense of conviction] by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*."[16] Several courts have concluded that, for two offenses to be considered part of a common scheme or plan, the acts "must be connected together by common participants

---

[13] *United States v. Moore*, 927 F.2d 825, 827 (5th Cir. 1991) (quoting *United States v. Mir*, 919 F.2d 940, 943 (5th Cir. 1990)) (internal quotation marks omitted); *see id.* ("To be considered as relevant conduct, drug related offenses need not result in the defendant's conviction."); *United States v. Edwards*, 911 F.2d 1031, 1033 (5th Cir. 1990) ("The district court can consider a broad range of conduct in assessing a defendant's offense level under the guidelines and is not limited solely to the conduct for which the defendant is being sentenced.").

[14] *Wall*, 180 F.3d at 644-45.

[15] *Bryant*, 991 F.2d at 177.

[16] U.S.S.G. § 1B1.3, cmt. n.9(A).

or an overall scheme."[17]  In *United States v. Wall*, we ruled that two offenses were not part of a common scheme or plan because (1) the offenses did not share any common accomplices, (2) there was no common *modus operandi*, as the earlier offense involved a small amount of marijuana and the later offense involved large quantities of marijuana concealed in pick-up trucks, and (3) the only common purpose between the offenses was "importing marijuana for distribution in the United States," which was, by itself, insufficient to establish a common scheme or plan.[18]

We conclude that Rhine's participation in the Fish Bowl drug-trafficking ring and his offense of conviction cannot be considered part of a common scheme or plan.  There is no evidence that Moore, Rhine's only accomplice in his offense of conviction, played any role in the Fish Bowl drug-trafficking ring.  Neither is there evidence that any Fish Bowl participant was involved in the instant incident.  Further, the offenses do not share a common *modus operandi*: In the Fish Bowl offense, Rhine is alleged to have been a large-scale supplier to mid-level dealers; by contrast, in the offense of conviction, he attempted to sell a small quantity of crack cocaine to an individual buyer for five dollars.  Finally, the only common purpose linking the two offenses is Rhine's motivation to profit from the distribution of crack cocaine, which — like the marijuana importation in *Wall* — is by itself insufficient to connect the offenses as separate parts of a common scheme or plan.[19]  We must therefore proceed to determine whether

---

[17] *See United States v. Hill*, 79 F.3d 1477, 1482 (6th Cir. 1996) (collecting cases) (internal quotation marks omitted).

[18] *Wall*, 180 F.3d at 645.

[19] *See United States v. Culverhouse*, 507 F.3d 888, 895 (5th Cir. 2007) (holding that two offenses were not part of a common scheme or plan when the offenses could only "be connected by . . . the most general of purposes, in that they both involved methamphetamine").

Rhine's alleged participation in the Fish Bowl drug-trafficking ring may properly be considered part of the same course of conduct as his offense of conviction.

## 2. Same Course of Conduct

The Guidelines state that "[o]ffenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to [the offense of conviction] as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."[20] Factors to consider in making this determination include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses."[21] A weak showing as to any one of these factors will not preclude a finding of relevant conduct; rather, "[w]hen one of the above factors is absent, a stronger presence of at least one of the other factors is required."[22]

### a. Temporal Proximity

To determine whether temporal proximity is present, we begin with the interval between the defendant's purported relevant conduct and the offense of conviction.[23] Because there is "no separate statute of limitations beyond which relevant conduct suddenly becomes irrelevant," a defendant's prior conduct will not necessarily be "placed off limits simply because of a lapse of time."[24] Nevertheless, "various courts have found that a period of separation of over one

---

[20] U.S.S.G. § 1B1.3, cmt. n.9(B).

[21] *Id.*

[22] *Id.*

[23] *See Culverhouse*, 507 F.3d at 896.

[24] *Moore*, 927 F.2d at 828; *see United States v. Santiago*, 906 F.2d 867, 872-73 (2d Cir. 1990) (stating that there are no "inherent limitations on the transactions to be considered").

year negated or weighed against [a finding of] temporal proximity."[25]  We have "generally used a year as the benchmark for determining temporal proximity."[26] For example, in *United States v. Miller*, we concluded that offenses separated by 21 months were "relatively remote in time" and held that "other factors must be authoritatively present in order to overcome this long gap."[27]

Here, at least 17 months separate any participation by Rhine in the Fish Bowl drug-trafficking ring from his offense of conviction.[28]  Although not dispositive, a hiatus this large suggests that temporal proximity is lacking.  We also find counter-indicative the lack of evidence that Rhine engaged in any intervening criminal activity, the presence of which might link his earlier conduct to the offense of conviction.[29]  The government urges us to overlook this

---

[25] *Wall*, 180 F.3d at 646; *see, e.g., Hill*, 79 F.3d at 1484 (6th Cir. 1996) ("[W]e find that temporal proximity is extremely weak in that nineteen months is an exceedingly long lapse between offenses."); *United States v. Maxwell*, 34 F.3d 1006, 1011 (11th Cir. 1994) (concluding that two offenses occurring more than a year apart were "temporally remote").

[26] *See United States v. Booker*, 334 F.3d 406, 414 (5th Cir. 2003).  *Compare Culverhouse*, 507 F.3d at 896 (concluding that temporal proximity was lacking when offenses were separated by almost three years), *and United States v. Miller*, 179 F.3d 961, 966 (5th Cir. 1999) (holding that offenses separated by 21 months were temporally remote), *with Bryant*, 991 F.2d at 177 (concluding that temporal proximity of roughly two months supported district court's finding of relevant conduct), *and Moore*, 927 F.2d at 826, 828 (holding that amphetamines seized five months prior to offense of conviction could be considered relevant conduct).  *But see United States v. Robins*, 978 F.2d 881, 890 (5th Cir. 1992) (concluding that "a hiatus of approximately one and one half years" did not render prior "similar transactions" irrelevant for sentencing purposes).

[27] 179 F.3d at 966, 967 n.10.

[28] As stated above, the Fish Bowl investigation culminated in a large-scale drug raid on May 17, 2006, but the informant on whose statement the probation officer relied indicated that he had stopped cooking crack cocaine for Rhine by approximately January 2006. Therefore, depending on which source one credits, Rhine's participation in the Fish Bowl drug-trafficking ring ended some time between January and May 2006, meaning that at least 17 months — and as many as 22 months — separate Rhine's earlier conduct from his offense of conviction.

[29] *See Moore*, 927 F.2d at 828 (finding that intervening arrest for marijuana possession helped connect defendant's earlier drug activity to his offense of conviction such that the

12

shortcoming, insisting that the apparent lack of intervening criminal activity is solely the result of the informants' imprisonment on federal drug convictions — and not Rhine's voluntarily abstention from criminal activity. This argument is unpersuasive, as it suggests that Rhine has the burden of proving the negative fact that he *did not* engage in any intervening criminal activity, when in fact it is incumbent on the government to show the positive fact of Rhine's continued drug distribution activities.

We conclude that temporal proximity is lacking, adding, however, that our conclusion does not necessarily preclude a finding of relevant conduct.[30] Offenses separated by 17 months — or even longer periods of time — might still be considered part of the same course of conduct if supported by a stronger presence of at least one of the other factors. In particular, we recognize that a lapse of time between prior conduct and the offense of conviction does not necessarily indicate that a defendant abandoned a course of conduct. In some cases, a lapse of time might merely mean that the defendant had to put a venture "on hold."[31] For example, in *United States v. Cedano-Rojas*, the Seventh Circuit concluded that a defendant's drug transaction that occurred two years prior to his offense of conviction was not too temporally remote to be considered relevant conduct.[32] The defendant in *Cedano-Rojas* had completed a large-scale drug transaction shortly before losing his supplier, after which he faced difficulties obtaining cocaine, resulting in a two-year gap between his earlier

---

earlier drug activity could be considered relevant conduct).

[30] *See Culverhouse*, 507 F.3d at 896 ("However, a failure in temporal proximity does not, by itself, prevent a finding of relevant conduct.").

[31] *See United States v. Cedano-Rojas*, 999 F.2d 1175, 1180 (7th Cir. 1993).

[32] *Id.*

offense and the offense of conviction.[33]   Describing the defendant's earlier offense as "relatively stale," the Seventh Circuit warned that courts must remain "cautious and exacting in permitting such . . . dealings to be included in the same course of conduct as the offense of conviction.[34]   Nevertheless, the Seventh Circuit affirmed the district court's finding of relevant conduct, basing its holding largely on the overwhelming evidence in support of similarity, as both offenses involved (1) large amounts of cocaine, (2) the same source and supplier, and (3) a nearly identical use of "mules" to distribute the drugs.[35]   Thus, even if, *arguendo*, we were to adopt the reasoning of *Cedano-Rojas* and find that Rhine had been forced to put his venture "on hold" following the Fish Bowl arrests, we would still need to determine whether a stronger presence of either similarity or regularity compensates for the absence of temporal proximity.[36]   Therefore, we must now determine whether there is sufficient evidence of similarity or regularity to support a finding that Rhine's earlier conduct and his offense of conviction were part of the same course of conduct, despite the attenuation between the end of the Fish Bowl ring's operations and Rhine's crime of conviction.

### b.    Similarity

To determine whether a defendant's earlier conduct is sufficiently similar to the offense of conviction, we inquire whether "there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a course of conduct rather than isolated, unrelated events that

---

[33] *Id.* at 1177-78.

[34] *Id.* at 1180.

[35] *Id.* at 1180-81.

[36] *Id.*

happen only to be similar in kind."[37] As we have previously cautioned, however, courts must not conduct this analysis at such a level of generality as to render it meaningless.[38] For example, in *Wall*, we concluded that two offenses were not sufficiently similar because (1) there was no evidence that the marijuana involved in each of the offenses shared a common source, supplier or destination, (2) there were no common accomplices, and (3) one of the offenses involved "large loads of marijuana secreted in the wheels and gas tank[s] of two pick-up trucks driven across the border," whereas the other offense involved only "a much smaller . . . load hidden [somewhere] in [the defendant's car]."[39]

Likewise, there are several material differences between Rhine's alleged participation in the Fish Bowl drug-trafficking ring and his offense of conviction. Rhine's instant offense involved possession of a very small quantity (1.89 grams) of crack cocaine with intent to sell some lesser portion of it to an individual buyer for five dollars; the sale took place in a vehicle; and Buchanan, the individual purchaser for her personal consumption, had just learned about Rhine from some unnamed source at a service station. In contrast, Rhine's alleged participation in the Fish Bowl drug-trafficking ring was said to have involved his acting as a large-scale manufacturer, distributor, and supplier of kilogram quantities of crack cocaine to numerous mid-level dealers. There are not even any allegations that Rhine sold to individual users during the Fish Bowl drug trafficking. Neither is there any suggestion that the two incidents involved any common participants or accomplices.

---

[37] *Culverhouse*, 507 F.3d at 896 (internal quotation marks and citation omitted).

[38] *See Wall*, 180 F.3d at 646-47 (quoting *United States v. Mullins*, 971 F.2d 1138, 1145 (4th Cir. 1992)).

[39] *Id.* at 646.

We conclude that similarity is lacking, as the differences between these offenses are significant. The quantities, methods of distribution, participants, and nature of the transactions — as well as the defendant's role in them — all vary substantially. Further, there is no evidence that the cocaine forming the basis for Rhine's offense of conviction shared a common source, supplier, or destination with the cocaine involved in the Fish Bowl activities.[40] Although the offenses both involve the distribution of crack cocaine, the mere fact that two separate offenses involve the same type of drug is generally not sufficient to support a finding of similarity.[41] To hold that these offenses are similar would be, in the words of the Fourth Circuit,

> to describe the defendant's conduct at such a level of generality as to eviscerate the evaluation of whether uncharged activity is part of the same course of conduct or common scheme or plan as the offense of conviction. With a brushstroke that broad, almost any uncharged criminal activity can be painted as similar in at least one respect to the charged criminal conduct.[42]

---

[40] *See Culverhouse*, 507 F.3d at 896 ("Nor is there any evidence that the methamphetamine in the two offenses shared a common source, supplier, destination, or that the two offenses involved a similar modus operandi."); *Wall*, 180 F.3d at 646 ("Notably, there is no evidence that the marijuana that formed the basis for the 1996 and 1997 offenses shared a common source, supplier, or destination with the marijuana involved in the 1992 offense.").

[41] *See Culverhouse*, 507 F.3d at 896 ("The fact that [the unadjudicated offense and the offense of conviction] both involved methamphetamine is not enough."); *Wall*, 180 F.3d at 646-47 ("We do not think that two offenses constitute a single course of conduct simply because they both involve drug distribution."); *Miller*, 179 F.3d at 967 (concluding that similarity was lacking because "[t]he only real similarity between the two [offenses] is that they both involved a transaction for the sale of cocaine").

[42] *Mullins*, 971 F.2d at 1145; *see Hill*, 79 F.3d at 1484 (stating that, if two drug transactions are separated by more than one year, a relevant conduct finding generally may not be premised on the sole similarity that the transactions involved the same drug).

Having satisfied ourselves that both temporal proximity and similarity are lacking, we must now determine whether there is a sufficiently strong presence of regularity to support a finding of relevant conduct.[43]

### c.  Regularity

To determine whether "regularity" is present, we inquire whether there is evidence of a regular, i.e., repeated, pattern of similar unlawful conduct directly linking the purported relevant conduct and the offense of conviction.[44] For example, in *Culverhouse*, we held that two dissimilar offenses separated by almost three years lacked regularity because there was no evidence of unlawful conduct occurring "between the [defendant's] prior transaction . . . and [his] later manufacturing."[45] In *Culverhouse*, the government had insisted that regularity was present because the defendant had been involved in several prior drug transactions, all of which had taken place before the offense the government sought to characterize as relevant conduct.[46] But, as we explained, "[t]he sentencing judge could not have relied on this evidence to establish the regularity required by § 1B1.3," primarily because the temporally remote offenses had not occurred between the earlier conduct and the offense of conviction.[47] We then concluded that, even if we were to consider the earlier offenses, our case law established that "five offenses over the course of fifteen years, separated as they are by time and circumstances, cannot be considered

---

[43] *See Culverhouse*, 507 F.3d at 896 ("While we question whether a showing of regularity alone could support a finding of relevant conduct when coupled with an absence of temporal proximity and similarity, we assume *arguendo* that a showing of sufficient regularity could provide the necessary support.").

[44] *See Wall*, 180 F.3d at 646, n.6.

[45] 507 F.3d at 897.

[46] *Id.* at 896-97.

[47] *Id.* at 897.

repetitious or regular conduct to a degree significant enough to constitute sufficient connection under the [G]uidelines."[48]

After reviewing the instant record, we conclude that regularity is lacking, as there is no evidence that Rhine engaged in any intervening criminal activity — much less drug distribution — between the Fish Bowl drug-trafficking ring and his offense of conviction. Without even a scintilla of evidence that Rhine sold drugs in the interim, the government nevertheless seeks to shift the burden to Rhine, insisting that he must prove the negative fact that he *did not* engage in a series of similar drug transactions. But we decline to adopt the government's assertion that regularity is present merely because of Rhine's inability to disprove an assertion that already finds no support in the record, and conclude instead that there is no evidence of intervening or repetitious criminal behavior that might link the two incidents together.

The government also insists that Rhine's three prior convictions for marijuana possession and cocaine distribution support a finding of regularity, even though the convictions all took place well before Rhine's alleged participation in the Fish Bowl drug-trafficking ring. Rhine counters that, under our precedent, a district court may not base a finding of regularity on a defendant's prior convictions or activity that did not take place between the purported relevant conduct and the offense of conviction.

It bears emphasizing that the overall purpose of this analysis is simply to determine whether the offense at issue is part of the "same course of conduct" as the offense of conviction, or, more specifically, whether the two are "sufficiently connected or related . . . as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."[49] Consequently, we decline

---

[48] *Id.* (internal quotation marks and citation omitted).

[49] U.S.S.G. § 1B1.3, cmt. n.9(B).

to adopt Rhine's suggestion that a district court may never consider a defendant's prior convictions or activities simply because they did not occur in the interval between the purported relevant conduct and the offense of conviction. Rhine's contention misstates our holding in *Culverhouse*, in which we concluded not only that the defendant's several prior transactions had preceded his purported relevant conduct, thus rendering their persuasive value questionable, but also that, even on the merits, those activities did not demonstrate sufficient regularity to overcome the absence of both temporal proximity and similarity. Indeed, there may be the rare case in which a prior conviction or prior activity informs this analysis by establishing a direct link, i.e., a pattern of regularity or repetition, between the purported relevant conduct and the offense of conviction (e.g., if a specific "course of conduct" began before the "relevant conduct" and continued through to the offense of conviction). But this, like *Culverhouse*, is not such a case. We are satisfied that Rhine's old, pre-Fish Bowl convictions do not establish a direct link or pattern of regularity between the two disparate and temporally remote incidents at issue, *viz.*, Rhine's alleged 2006 participation in a large-scale drug trafficking ring and his 2007 conviction for a relatively small, street-level drug deal.

In sum, Rhine's alleged participation in the Fish Bowl activities cannot be considered part of the same course of conduct as his instant offense, as temporal proximity, similarity, and regularity are all lacking.

## C. Sixth Amendment

Having concluded that Rhine's alleged participation in the Fish Bowl drug-trafficking-ring cannot properly be considered relevant conduct, we need not address the merits of his Sixth Amendment claim. We note, however, that the claim is foreclosed by our precedent.[50]

---

[50] *See United States v. Johnson*, 445 F.3d 793, 798 (5th Cir. 2006) (explaining that, following *United States v. Booker*, 543 U.S. 220 (2005), "[t]he sentencing judge is entitled to

19

## III. CONCLUSION

For the foregoing reasons, we conclude that the district court clearly erred by treating Rhine's alleged participation in the Fish Bowl drug-trafficking ring as relevant conduct for purposes of sentencing on his offense of conviction. Rhine's activity in the Fish Bowl operations and the instant offense are not part of a common scheme or plan, as the two disparate incidents lack common accomplices, common victims, a common purpose, or a common *modus operandi*. Neither can the two disparate incidents be considered part of the same course of conduct, as temporal proximity, similarity, and regularity are all lacking. We therefore VACATE Rhine's sentence and REMAND for re-sentencing in conformity with this opinion.

---

find by a preponderance of the evidence all the facts relevant to the determination of a guideline sentencing range"); *United States v. Alonzo*, 435 F.3d 551, 553 (5th Cir. 2006) (same).