IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 30, 2010

Lyle W. Cayce
Clerk

No. 09-40394

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JUAN ANTONIO ORTIZ,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before WIENER, PRADO, and SOUTHWICK, Circuit Judges.

Leslie H. Southwick, Circuit Judge.

Juan Antonio Ortiz pled guilty to possession with intent to distribute more than 100 kilograms of marijuana. On appeal, Ortiz claims the district court erred in calculating his total drug quantity amount. We agree. We VACATE Ortiz's sentence and REMAND for resentencing.

FACTS

The government's undisputed proffer at Ortiz's rearraignment is the source for the following factual summary. In May 2007, Immigration and Customs Enforcement ("ICE") agents were conducting a drug investigation in Brownsville, Texas. On May 7, an ICE undercover operative provided Juan Miguel Pineda with a Chevrolet Suburban to use for transporting drugs. That

night, agents were watching as Juan Pineda's cousin, Fernando Pineda, Jr., drove the Suburban to a complex of condominiums within the Brownsville Country Club. Twenty minutes later, the agents followed the Suburban to a gasoline station. There, Fernando met Juan and switched vehicles with him. Then both men left in separate vehicles and drove north toward Harlingen. Within ten minutes, both were stopped for traffic violations. Agents discovered 214.64 kilograms of marijuana inside the Suburban. The Pinedas told the agents that they had loaded the marijuana from a condominium garage at the country club. Agents located the condominium. It was leased to Cristal Pulido-Sotelo. They noticed a strong odor of marijuana. A narcotics dog noticed, too, and alerted at the garage door. Agents knocked, but no one responded.

Agents returned to the condominium the next day. They arrested Ortiz, Pulido-Sotelo, and Enedelia Cuellar. Approximately 270 kilograms of marijuana were in plain view in the kitchen, another 466 kilograms were in closets within the garage, and 550 grams of cocaine were inside a suitcase in the first bedroom.

Ortiz admitted that he was aware of the marijuana in the house and that he had provided the Pineda cousins with the marijuana discovered in the Suburban. Cuellar gave a statement claiming ownership of the suitcase in which the cocaine was found. She later claimed a friend gave her the suitcase the previous day and was supposed to pick it up later.

Ortiz was charged with drug possession and conspiracy offenses in a six-count, multi-defendant indictment. On September 5, 2007, Ortiz pled guilty to possession with intent to distribute more than 100 kilograms of marijuana. Ortiz did not dispute anything in the government's fact proffer and stated that he had nothing else to add. His counsel, though, said that Ortiz would challenge any inclusion of the cocaine as part of his relevant conduct at sentencing.

Although his conviction involved only 100 kilograms, his Pre-sentence Report ("PSR") determined Ortiz to be responsible for 1,063.59 kilograms of marijuana and its equivalent. See U.S.S.G. § 2D1.1 cmt. 10 (explaining drug equivalency). The total included the 738.95 kilograms of marijuana seized from the house, the 214.64 kilograms of marijuana seized from the Suburban, and the 550 grams of cocaine, which, for sentencing purposes, has an equivalent value of 110 kilograms of marijuana. Id. § 2D1.1 cmt. 10(E). This drug quantity corresponded with a base offense level of thirty-two. Id. § 2D1.1(c)(4) (more than 1,000 kilograms but less than 3,000 kilograms of marijuana).

The probation officer recommended a two-level enhancement due to Ortiz's role as an "organizer, leader, manager, or supervisor," but a three-level reduction for acceptance of responsibility. The total offense level of 31, combined with a criminal history category of V, resulted in an advisory Guidelines range of 168 to 210 months. Ortiz raised two objections to the PSR that continue to be asserted here.

First, he argued that he should not be held accountable for the cocaine discovered in Cuellar's suitcase. This objection was overruled.

Second, he argued that the drug quantity calculation should reflect the weight of the drugs alone and not the gross weight of the drugs and packaging. After hearing testimony from the probation officer and the ICE case agent, the district court overruled Ortiz's objection as to the marijuana. The basis for this decision was that no net weight measurement of the marijuana had been taken before it was destroyed, and there was no judicial consensus on what percentage by which the gross weight should be reduced in order to get the correct net weight. Thus, the district court found that Ortiz was accountable for the gross weight of the marijuana and packaging, which amounted to 953.59 kilograms.

As to the cocaine, though, a net weight measurement did exist. The district court sustained Ortiz's objection with respect to the cocaine and used the net weight of 500.6 grams rather than the gross weight of 550 grams for the drug quantity calculation. This reduction of approximately 50 grams equated to a 10 kilogram reduction in marijuana equivalency. See id. § 2D1.1 cmt. 10(E).

As a result of the objection, Ortiz was now accountable for 1,053.59 kilograms. The change had no effect on the Guidelines calculation, as the new quantity left him within the 1,000 to 3,000 kilograms range. His Guideline range of 168 to 210 months remained unchanged.

Ortiz was sentenced to 120 months in prison, which was the sentence requested by the government. The written judgment, though, stated that 120 months was the mandatory minimum sentence.

On appeal, Ortiz challenges the calculation of his sentence and the statement that 120 months was the mandatory minimum sentence.

DISCUSSION

The pro se notice of appeal was untimely. The government notes the untimeliness but does not object to considering the merits. The time limit for appeal can be waived. United States v. Martinez, 496 F.3d 387, 388-89 (5th Cir. 2007). We will review the merits of Ortiz's claims.

Sentences both inside and outside the Guidelines range are reviewed for abuse of discretion. Gall v. United States, 552 U.S. 38, 51 (2007). First, the court must determine whether the district court committed any significant procedural errors, such as improperly calculating the Guidelines range. Id. If the sentence is procedurally sound, the court considers the substantive reasonableness of the sentence imposed. Id. The district court's application of

the Guidelines is reviewed de novo, and factual findings are reviewed for clear error.  United States v. Klein, 543 F.3d 206, 213 (5th Cir. 2008).

I. Cocaine Attributed to Ortiz as Relevant Conduct

We need to expand on the discussion of the facts in order to assess the validity of attributing the cocaine to Ortiz as relevant conduct for sentencing.

Juan Ortiz lived with his wife and children in Matamoros, Mexico.  Ortiz paid the rent on the condominium at the Brownsville Country Club where the drugs were found.  Living there were Cristal Pulido-Sotelo, with whom Ortiz was having an affair, and her young daughter.  Ortiz used the condominium as a stash house for marijuana and occasionally stayed overnight.

Enedelia Cuellar lived in Matamoros.  She was friends with Pulido-Sotelo and often stayed during weekends at the condominium so she could enjoy the Brownsville nightlife.  Cuellar usually shared the first bedroom with Pulido-Sotelo while Pulido-Sotelo's daughter slept in the second bedroom.

How the suitcase containing cocaine came to be at the condominium is not conclusively shown.  Among the versions is one in the PSR.  It states that on May 6, 2007, Cuellar spent the night with an unidentified male friend in Brownsville.  The following morning, Cuellar went to Matamoros to ask her mother for some money.  Soon after she returned to Brownsville, Cuellar's male friend contacted her to ask if she was going to pick up her suitcase.  Cuellar arranged for the two of them to meet at the port of entry so that she could retrieve it.  After getting her suitcase back, Cuellar was picked up by "Shelly," a female she had only known for a short time.  That evening, which was the night the Pinedas were arrested, Cuellar arrived at Pulido-Sotelo's condominium with the suitcase.  She then left to visit various Brownsville nightclubs.

Other stories about the suitcase were given during debriefing sessions. None of them directly connect the suitcase or the cocaine to Ortiz.

While Cuellar was out, ICE agents came to the condominium and detected the odor of marijuana. When Cuellar returned in the early morning hours, she noticed the marijuana in the kitchen. Since Ortiz and Pulido-Sotelo were in the first bedroom where Cuellar usually slept, Cuellar slept in the second bedroom with Pulido-Sotelo's daughter.

On May 8, ICE agents returned to the condominium and "knocked and announced" their presence. However, after seeing a female approach the door and then rush back into the condominium, the agents entered without a warrant. No challenge to the entry and search is made on appeal. Once inside, the agents saw marijuana in plain view in the kitchen. On that basis, they arrested Ortiz, Pulido-Sotelo, and Cuellar. A search of the condominium led to the discovery of more marijuana in the garage as well as the cocaine under women's clothing in the suitcase. The suitcase was in the first bedroom where Ortiz and Pulido-Sotelo had spent the night. It was also where the two were located when the agents entered the condominium.

Following his arrest, Ortiz admitted being a regular cocaine user and that he had used some on the morning he was arrested. The cocaine in the suitcase was the only cocaine discovered in the apartment. Ortiz has always denied having any knowledge about the cocaine in the suitcase.

At the sentencing hearing, defense counsel argued that the cocaine should not be attributed to Ortiz as relevant conduct. Counsel claimed that Cuellar put the suitcase in the first bedroom when she arrived at the condominium, because she planned to sleep in that room as usual when she returned from the nightclubs. Ortiz's connection with the cocaine was only that it happened to be in the room in which he spent the night.

In support of this argument that there was no connection between Ortiz and the cocaine, the defense counsel called ICE case agent Amador Zapata and probation officer Enrique Guerra to testify. Zapata provided background information about the discovery of the cocaine. Ortiz's counsel then asked whether there was any evidence tying Ortiz to the cocaine other than the fact that he rented the condominium with Pulido-Sotelo. Zapata responded:

> No, I have even submitted the cocaine to be fingerprinted. I submitted all individuals' fingerprints to be compared to any successful prints taken off the cocaine, and there were no successful prints removed from the cocaine wrappings. Therefore, . . . we weren't able to fully identify in that manner who might have touched the cocaine. But there's nothing to tell me that any one of those three — or all three could have put the cocaine in there. I have no idea.

On cross-examination, Zapata explained that the suitcase was three to four feet away from the bed where Ortiz and Pulido-Sotelo had spent the night. The only reason he associated the cocaine with Cuellar was that it was found in her suitcase under women's clothing. Zapata also explained that he believed all three individuals lied during their debriefing sessions and that it was difficult to determine the truth. For example, Zapata was suspicious of Pulido-Sotelo's statements that Cuellar imported the cocaine from Mexico. He thought that to be unlikely because importers rarely hold on to drugs once they cross the border. Zapata said ICE also had no prior intelligence of Cuellar being involved in cocaine trafficking. In response to the government's questions, Zapata explained that it was possible Ortiz put the cocaine in the suitcase when the police entered the condominium in an effort to distance himself from it.

Defense counsel also called probation officer Enrique Guerro. The officer explained why he included the cocaine as part of Ortiz's relevant conduct:

> We held that Mr. Ortiz's relevant conduct as far as him providing Ms. Pulido-Sotelo the apartment, paid for her rent, gave

her an additional allowance per week, stored the drugs in said place, the drugs that were seized from the Suburban were loaded in that particular place, we felt that everything should be accountable to him.

The cocaine that was found inside the red suitcase, we felt that since he rented the apartment, he was paying for the rent, anything that was found within the house he should be held accountable for.

The district court found by a preponderance of the evidence that the cocaine was properly attributable to Ortiz as relevant conduct. The district court noted that Ortiz was in charge of the drug trafficking being operated out of the condominium, that he had previous drug trafficking convictions, and that he was admittedly a frequent user of cocaine. In contrast, Pulido-Sotelo and Cuellar had no criminal histories and had only admitted using cocaine on four occasions and on one occasion, respectively. Furthermore, the district court explained that it found the story of how Cuellar claims to have received the suitcase to be very unbelievable. The district court noted that a more likely scenario was that Cuellar brought the drugs to the condominium at Ortiz's instruction and that "Ortiz, being more experienced, knew that by placing the cocaine in that suitcase that he could back away from it and . . . leave the defendant Cuellar holding the bag for all practical purposes."

The marijuana equivalent of the cocaine was included in Ortiz's total drug quantity for the purposes of calculating his base offense level. This added 100 kilograms of marijuana to Ortiz's total.

Now that we understand why Ortiz was held responsible for the cocaine, we examine the legal basis for doing so. When calculating a defendant's base offense level in a drug case, the district court may consider a defendant's relevant conduct. United States v. Culverhouse, 507 F.3d 888, 895 (5th Cir. 2007). Relevant conduct is defined as "all acts and omissions" that were either

(1) part of a "common scheme or plan" or (2) part of the "same course of conduct" as the offense of conviction. U.S.S.G. § 1B1.3(a)(2). Factual findings regarding relevant conduct are reviewed for clear error. United States v. Rhine, 583 F.3d 878, 885 (5th Cir. 2009). These findings are not clearly erroneous as long as they are "plausible in light of the record as a whole." Id. We examine each factor.

(1)    Common Scheme or Plan

An unadjudicated offense may be part of a "common scheme or plan" if it is "substantially connected to [the offense of conviction] by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." Id. at 885 (quoting U.S.S.G. § 1B1.3 cmt. n.9(A)) (alterations in original). We broadly define what constitutes a "common scheme or plan" in a drug distribution case. Id. However, the analysis cannot be too broad, otherwise "almost any uncharged criminal activity can be painted as similar in at least one respect to the charged criminal conduct." Id. at 889 (quoting United States v. Mullins, 971 F.2d 1138, 1145 (4th Cir. 1992)).

There are no common victims, and the modus operandi of the two offenses are not similar. Therefore, we examine whether it is plausible in light of the record as a whole for the district court to have found that there were common accomplices or purposes.

Ortiz argues that Pulido-Sotelo, the Pineda cousins, his marijuana supplier, and the person who was to receive the marijuana were his accomplices, and that there is no evidence any of these individuals were also involved in the cocaine offense. Rather, he argues the evidence shows that the only known participants in the cocaine offense were Cuellar, her unidentified male friend, and the "Shelly" who picked her up after the suitcase had been delivered at the border to Cuellar.

The government relies on circumstantial evidence suggesting that Cuellar may have been an accomplice in both offenses. During at least one of the debriefing sessions, one of the Pinedas told ICE agents that three women helped move the marijuana from the condominium garage to the Suburban. Pulido-Sotelo was later identified as one of these women. Although no one ever identified them, the government theorizes that the other two women may have been Cuellar and Pulido-Sotelo's young daughter. This argument presents only speculation that Cuellar may have been involved in both offenses. The district court did not find that Cuellar was.

In addition, the general goal of selling drugs for a profit is insufficient to satisfy the common purpose factor. We have vacated a sentence where the only factor indicating a common scheme or plan was that the two offenses shared the goal of importing drugs into the United States. United States v. Wall, 180 F.3d 641, 645 (5th Cir. 1999). Ortiz's case is similar in that the only factor suggesting the existence of a common scheme or plan is the very general goal of selling drugs for profit. It is also error to define relevant conduct too broadly. See Rhine, 583 F.3d at 889. Such overbreadth exists when concluding that the marijuana and cocaine offenses were part of a common scheme.

(2) Same Course of Conduct

An unadjudicated offense that is not part of a common scheme or plan with the offense of conviction may still be considered relevant conduct if the offenses are part of the "same course of conduct." U.S.S.G. § 1B1.3 cmt. 9(B). Unadjudicated offenses can be considered part of the same course of conduct "if they are sufficiently connected or related to [the offense of conviction] as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." Id.

The Guidelines identify factors that help in this determination:

> [1] the degree of similarity of the offenses, [2] the regularity (repetitions) of the offense, and [3] the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required.

Id.

Two offenses may be sufficiently similar to be part of the same course of conduct if "there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." Wall, 180 F.3d at 646(quoting United States v. Maxwell, 34 F.3d 1006, 1011 (11th Cir. 1994)).

There are no such distinctive similarities here. Other than the fact that the cocaine was discovered in the same condominium as the marijuana, there is no evidence that the marijuana and cocaine offenses are similar. There is no evidence that there were any common accomplices, suppliers, or buyers between the two offenses. In addition, the marijuana offense involved massive quantities of the drug, much of it in plain view, throughout the condominium. In contrast, the relatively small amount of cocaine was located in one bag hidden inside Cuellar's suitcase. The fact that both marijuana and cocaine are illegal drugs is not enough for us to find that they arise from the same course of conduct.

Deciding the "regularity" of the offense is a search for a "pattern of similar unlawful conduct directly linking the purported relevant conduct and the offense of conviction." Rhine, 583 F.3d at 889-90. Ortiz has two previous convictions for drug offenses, both of which involved the transportation or receipt of fairly large quantities of marijuana. The regular conduct that such proof supports is that Ortiz is involved in marijuana trafficking. It is not proof of regular conduct involving other drugs. There is no evidence that cocaine importing, or perhaps even importing whatever the supply, the demand, and the law enforcement risks

11

make most advisable, was Ortiz's pattern. Instead, we have a criminal who regularly engages in a particular kind of crime.

The marijuana and cocaine offenses occurred temporally and physically together. The condominium was being used as a drug stash house. There was strong evidence that Ortiz was in charge of the condominium. Yet in this drug distribution case, when the fact that two different drugs were in the same place at the same time is all that is offered to prove two offenses are part of the same course of conduct, and when the other evidence does not suggest any connection at all, a "substantial connection" has not been shown to be plausible.

The evidence revealed a significant marijuana trafficking operation for which Ortiz had central responsibility. It also revealed a separately packaged, separately delivered quantity of cocaine in a suitcase, which the direct evidence connected to someone else. Only speculation based primarily on the proximity of the cocaine's container connected the cocaine to Ortiz. This is not evidence that the cocaine and the marijuana were joined in an "episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 cmt. 9(B). The district court erred by attributing the cocaine to Ortiz as relevant conduct.

By considering the cocaine to be part of the relevant conduct, Ortiz was held accountable for over 1,000 kilograms of marijuana and its equivalent. Removing the cocaine from the calculation results in a total drug quantity of 953.59 kilograms of marijuana. This revised total means that Ortiz is now accountable for between 700 and 1,000 kilograms of marijuana rather than being accountable for between 1,000 and 3,000 kilograms. Accordingly, Ortiz's revised base offense level will be 30 rather than 32. Id. § 2D1.1(c)(5). This lower amount changes the sentencing range. Consequently, we vacate the sentence.

II. Use of Gross Weight of Marijuana

12

Ortiz also argues that the district court erred by using the gross weight, rather than the net weight, of the marijuana when calculating his total drug quantity. The gross weight was shown to be 953.59 kilograms.

We have been given various estimates by the parties as to how much of a reduction in the quantity of marijuana would occur by using different estimates of the weight of the packaging. None of those would remove the quantity from the newly established 700 to 1,000 kilogram range. Because of this reduction resulting from removal of the cocaine, any possible error in the use of the gross weight of the marijuana would be harmless. We decline to address possible error in how the gross versus net weight issue was resolved.

One other point needs making. The government concedes that 60 months, not 120 months, was the mandatory minimum sentence. 21 U.S.C. § 841(b)(1)(B). Any new sentence needs to be entered with that in mind.

We VACATE Ortiz's sentence and REMAND for resentencing.