FILED
United States Court of Appeals
Tenth Circuit

January 7, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JASON DAVON GARCIA,

Defendant - Appellant.

No. 18-6033

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:17-CR-00106-HE-1)**

---

Lynn C. Hartfield, Law Office of Lynn C. Hartfield, LLC, Denver, Colorado, for Defendant-Appellant.

Steven W. Creager, Assistant United States Attorney (Robert J. Troester, Acting United States Attorney, and Jacquelyn M. Hutzell, Assistant United States Attorney, with him on the brief), Office of the United States Attorney, Western District of Oklahoma, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **HARTZ**, **HOLMES**, and **CARSON**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Jason Davon Garcia seeks review of a sentence of ninety-six months'

imprisonment imposed after he pleaded guilty to being a felon in possession of a

firearm. He claims that the district court erred in considering his earlier possession of two handguns as relevant conduct and that the sentence the court imposed on him is substantively unreasonable.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we reject Mr. Garcia's challenges. We review Mr. Garcia's relevant-conduct argument for plain error and conclude that the district court did not plainly err in treating his prior incident of handgun possession as relevant conduct as to his offense of conviction. We also conclude that the district court's sentence is not substantively unreasonable. We therefore **affirm**. More specifically, Judge Hartz concurs in the judgment and joins the following opinion except for Part II.

**I**

In May 2017, a federal grand jury sitting in the Western District of Oklahoma returned an indictment alleging that, on or about April 21, 2017, in Oklahoma City, Oklahoma, Mr. Garcia violated 18 U.S.C. § 922(g)(1) by possessing a firearm after having previously been convicted of a felony. Mr. Garcia pleaded guilty to the Indictment's sole count without a plea agreement.

The Probation Office then prepared a Presentence Report ("PSR").[1]  In describing Mr. Garcia's offense conduct, the PSR observed that, on April 24, 2016—nearly a year before the April 2017 firearm possession, which formed the basis of his offense of conviction—officers from the Oklahoma City Police Department ("OCPD") encountered Mr. Garcia and his girlfriend at a gas station in a high-crime area, started talking to him, requested his identification, and asked whether he was carrying any weapons.  Mr. Garcia disclosed that he was carrying a gun, and an officer found two loaded handguns in Mr. Garcia's waistband.  The officer arrested Mr. Garcia on an outstanding warrant, and he was later charged in state court with being a felon in possession of a firearm.

The PSR also described the events directly giving rise to Mr. Garcia's current conviction: Specifically, in April 2017, OCPD officers were called to a high school and spoke to the daughter of Mr. Garcia's girlfriend.  The daughter reported that her mother (i.e., Mr. Garcia's girlfriend) had locked herself in a bedroom to "get away from" Mr. Garcia, who "was agitated" and "had his rifle out."  R., Vol. II, ¶ 8, at 6 (PSR, originally filed Nov. 22, 2017, revised Dec. 18, 2017).  Other officers went to the house where Mr. Garcia's girlfriend was

---

[1]     The Probation Office used the 2016 edition of the United States Sentencing Guidelines Manual in preparing the PSR.  That decision is not challenged here.  Accordingly, we also use that edition when resolving the issues in this appeal.

located and convinced her to leave with them. Officers later interviewed her, and she stated that Mr. Garcia "suddenly became upset with her and hit her with an unknown object" and "punched her in the leg." *Id.* Officers saw a "fresh wound with blood" on her leg. *Id.*

Mr. Garcia's girlfriend had told officers that he "had his rifle out" during the incident at the house, but she later told them that she had not seen him "get the rifle out in six months." *Id.* Officers noted that she seemed frightened about what Mr. Garcia might do to her and seemed reluctant to tell them "the whole truth." *Id.* She also expressed concern that Mr. Garcia would commit "suicide by cop" rather than go back to jail. *Id.* The girlfriend gave consent to search the house, and officers discovered a loaded rifle under Mr. Garcia's bed and 108 rounds of ammunition throughout the house.

The PSR calculated a total offense level of twenty-one. In doing so, it applied a two-level enhancement under § 2K2.1(b)(1)(A) of the United States Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines") for an offense involving three or more firearms; the number comprises the rifle forming the basis for the conviction and the two handguns discovered in the April 2016 firearms incident. The PSR observed that the April 2016 incident and the April 2017 offense of conviction occurred a little less than a year apart.

The PSR then set forth Mr. Garcia's criminal history. Mr. Garcia has a long criminal record, consisting of mostly state offenses that date back to when he was a juvenile. His record includes a 1993 juvenile adjudication for possessing a weapon (i.e., an unloaded pistol) on school property when Mr. Garcia was sixteen years old. His record also includes subsequent adult convictions for, *inter alia*, burglary and attempted automobile burglary, as well as discharging a firearm from a motor vehicle (in 1994, when he was seventeen years old); pointing a firearm at another (in 1996, when he was nineteen years old); domestic abuse (in 2002, when he was twenty-five years old); and unlawful possession of marijuana, methamphetamine, and drug paraphernalia, as well as unlawful shipment, transfer, receipt, or possession of stolen firearms (in 2008, when he was thirty-one years old). Notably, the PSR did not assign criminal-history points to over a dozen of Mr. Garcia's prior convictions because they were not countable, for various reasons, under the Guidelines—a majority of them merely because they were too old.

According to the PSR, Mr. Garcia's subtotal criminal history score was three, and one of those criminal-history points stemmed from a 2007 conviction for possession of methamphetamine for which he received a five-year suspended sentence in June 2011. The PSR added two points to his subtotal criminal-history score, pursuant to Guidelines § 4A1.1(d), because Mr. Garcia "committed the

5

instant offense while under a criminal justice sentence" resulting from the 2007 conviction. *Id.*, ¶ 52, at 19. This calculation yielded a total of five criminal-history points, placing Mr. Garcia in criminal-history category III. Based on a total offense level of twenty-one and a criminal-history category of III, the PSR found that the Guidelines range was forty-six to fifty-seven months' imprisonment. *Id.*, ¶ 96, at 28.

The PSR also identified factors that might warrant a non-Guidelines sentence. In particular, when discussing whether an upward variance would be justified, the PSR generally stated the following:

> Based on the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, the need to afford adequate deterrence to criminal conduct, and the need to protect the public from further crimes of the defendant, an upward variance may be warranted.

*Id.*, ¶ 119, at 31. In particular, the PSR commented as follows:

> The defendant sustained his first felony conviction shortly after he turned 18; for essentially his entire adult life it has been unlawful for him to possess firearms. However, he has repeatedly continued to disregard the law both with respect to firearms and other criminal activity. . . . The defendant's possession of a firearm is particularly concerning – more so than the "average" felon in possession case – because of his history involving pointing and discharging firearms. This concern is further increased because of the defendant's apparently unstable mental state and his ongoing involvement in domestic violence.

*Id.*, ¶ 120, at 31–32.

6

In urging the court to consider imposing an upward variance, the Probation Office stressed that the Guidelines range did not adequately take into account the seriousness and longstanding nature of Mr. Garcia's criminal conduct. Underscoring the seriousness of his criminal record, the PSR noted that Mr. Garcia was only one qualifying conviction short of the three required to subject him to a sentence under the Armed Career Criminal Act ("ACCA"), which requires courts to impose a fifteen-year mandatory-minimum prison term on eligible offenders.[2]

And, regarding the concern posed by Mr. Garcia's mental state, the PSR reported, among other indicators of significant mental instability, that Mr. Garcia had been diagnosed on two prior occasions as suffering from "Antisocial Personality Disorder," that he had previously noted "his own weaknesses as hurting those he cares about and feeling no pain," and that currently he "reported experiencing visual and auditory hallucinations." *Id.*, ¶¶ 72–73, at 24.

Mr. Garcia filed objections to the PSR's Guidelines computations, arguing in pertinent part that the two additional criminal-history points had been

---

[2]     The PSR informed the court that, as a matter of law, Mr. Garcia was not eligible for the ACCA's fifteen-year mandatory-minimum sentence because our court had determined that the crime forming the basis for one of his prior convictions—the 1996 Oklahoma offense for pointing a firearm—did not qualify as a "violent felony" under the ACCA. *See* R., Vol. II, ¶121, at 32 (citing *United States v. Titties*, 852 F.3d 1257 (10th Cir. 2017), in which we held that Oklahoma's offense for pointing a firearm was not a violent felony).

improperly assessed, pursuant to Guidelines § 4A1.1(d), because his five-year suspended sentence for methamphetamine possession expired in June 2016, "prior to the allegations in the case before the [district] [c]ourt"—that is, the April 2017 unlawful firearm-possession offense. *Id.* at 33 (Addendum to PSR, filed Dec. 18, 2017).

The Probation Office responded that, in April 2016, *prior to* the expiration of his suspended sentence, Mr. Garcia had unlawfully possessed two handguns, and this possession was relevant conduct with respect to his subsequent April 2017 offense of conviction. Therefore, it reasoned that adding the two points for committing "the instant offense while under any criminal justice sentence" was appropriate. U.S.S.G. § 4A1.1(d). More specifically, referencing the Guidelines commentary, the Probation Office explained that the "instant offense," which § 4A1.1(d) contemplates, is not limited to just the crime of conviction—which admittedly occurred in April 2017, after his suspended sentence expired. Rather, this term, said the Office, encompasses relevant conduct, such as his April 2016 incident involving the unlawful possession of firearms. R., Vol. II, 34. Thus, at the time of that incident (i.e., in April 2016) Mr. Garcia was still under a "criminal justice sentence" and thus two additional criminal-history points were properly attributed to him.

The district court considered Mr. Garcia's objections during a sentencing hearing. Defense counsel initially said that he would stand on his written objections, while the government stated that it agreed with the Probation Office's assessment. As relevant here, defense counsel subsequently reiterated that Mr. Garcia was not "subject to any criminal indictment, supervision, or probation at the time this offense occurred," such that "that [§ 4A1.1(d)] enhancement would not apply." *Id.*, Vol. III, at 56 (Sentencing Tr., filed Apr. 6, 2018). Notably, Mr. Garcia did not specifically object to the Probation Office's predicate finding that the April 2016 incident was relevant conduct as to the April 2017 offense of conviction.

However, the government agreed with this relevant-conduct finding and made it the centerpiece of its argument. It emphasized that the April 2016 incident was relevant conduct because Mr. Garcia's actions were "just a continuing set of circumstances where [he] was repeatedly and continuously possessing firearms as a felon." *Id.* at 57. The district court asked whether defense counsel had "[a]nything . . . to add to" the government's analysis, and defense counsel responded, "[n]o." *Id.* at 57–58.

The district court stated that the relevant-conduct question was "close" due to the "the amount of time that elapsed between" the April 2016 incident and the April 2017 offense of conviction, but it ultimately overruled Mr. Garcia's

9

objection because there was "a more or less continuous course of conduct over an extended period of time involving possession of firearms by [Mr. Garcia] in various contexts." *Id.* at 58. The district court ultimately adopted the PSR's Guidelines computations.

Mr. Garcia and counsel made statements prior to sentencing. Defense counsel contended that Mr. Garcia had "made it as painless as can be for the [g]overnment" by pleading guilty, and counsel urged the court to consider that Mr. Garcia had been in custody "for in excess of eight months" based on the instant offense with "no misconducts." *Id.* at 59. Mr. Garcia stated that he had "time to think about a lot of things" while in custody and would not exercise similar "poor judgment" in the future. *Id.* at 59–60. The government requested a sentence at the high end of the Guidelines range. Specifically, the government noted Mr. Garcia's "lifetime of criminal activity," which had been "virtually nonstop" since he was sixteen. *Id.* at 60–62.

The district court, however, elected to vary upward instead from the Guidelines sentencing range and imposed a term of ninety-six months' imprisonment. After noting its duty to consider the Guidelines and relevant statutory factors, it offered a rationale for its decision:

> The things that the statute requires me to consider include the nature and circumstances of the offense.

Here, of course, I've considered the fact that [Mr. Garcia] was picked up apparently during a relatively violent episode where the rifle was present.

There was at least some suggestion in the [PSR] that he had access to it in connection with this dispute with his wife[3] that triggered the immediate inquiry from law enforcement.

It appears that -- from the condition and circumstances of the house, that [Mr. Garcia] was, if not planning for a shootout, at least equipped for one.

And so that, coupled with the fact that we have had multiple instances of [Mr. Garcia] dealing with guns over an extended period of time and all subsequent to an early felony conviction many years ago, suggests to me that we have a very serious set of circumstances here because, as counsel for the [g]overnment has suggested, there has been *a long, more or less continuous history of law-breaking by [Mr. Garcia]*.

But it appears that throughout virtually the entire period of his adult life, *when he's committed these other crimes, he's also had guns around*. So this circumstance here is, in my view, a very serious offense.

I'm required to consider [Mr. Garcia's history]. The most pertinent thing, of course, is that he does have a long, pretty much continuous history of breaking the law, criminal convictions for one thing or another.

---

[3]     The district court apparently misspoke in referring to the female involved in the April 2017 incident, which gave rise to Mr. Garcia's offense of conviction, as his "wife"; the PSR consistently refers to the woman as Mr. Garcia's "girlfriend." *See, e.g.*, R., Vol. II, ¶ 7, at 3. Mr. Garcia does not refer to this seemingly minor mistake in his appellate briefing, much less contend that it has any material bearing on his appellate challenges. Therefore, we do not consider the matter further.

At least some of those convictions are for violent conduct, both in terms of the domestic abuse, and I recall one, I think, was a drive-by shooting or something equivalent to that.

So we have a very serious streak of violent conduct as a part of the broader range of criminal activity he's been involved in.

[Mr. Garcia] appears to have mental health issues of some sort, at least in the sense of anger management -- maybe more serious than that -- that also, I think, contributes to the seriousness of what we're dealing with here.

[The government] has mentioned the factor that I think is probably the most important of the statutory factors. In some cases, it's not the most important, *but here I think it probably is. That's the need to protect the public from further crimes of [Mr. Garcia]*.

I appreciate what [Mr. Garcia] said here today, in terms of learning his lesson, and I hope that's true, but the history that I am looking at here over the last 15 or 20 years suggests to me that there were a lot of opportunities to learn that lesson and it didn't get learned.

So I think there is a substantial need to protect the public from the risk of further criminal activity of [Mr. Garcia], *partly reflected by the repetitive nature of his criminal activity generally, but also from the repetitive nature of these situations where he's illegally possessing a firearm and, in some cases, it appears, using it*. So all of that adds to the seriousness here.

I think that, in my view, this is simply a situation where the [G]uideline[s] range *does not reach an adequate sentence*.

     . . . .

It just seems to me that when you consider, in this case, *the lengthy history of criminal conduct, as [the government] has*

*pointed out, running more or less continuously from the age of 16 or 17*, the fact that much of it was violent in terms of these battery situations, the drive-by incident, the amm[unition] in the house, the various aspects of that, the repeated possession of the guns, and I think, as I say, the anger management/mental-health-type issues that appear to be part of it, this is simply a situation *where the risk to the public from the defendant is very significant*, and I think there is a need to protect the public from the risk of further crimes. And the [G]uideline[s] sentence, in my view, does not get there.

So it's going to be the judgment of the Court that [Mr. Garcia] be committed to the custody of the Bureau of Prisons for a term of 96 months.

*Id.* at 62–66 (emphases added).

The district court entered judgment consistent with this ruling, and Mr. Garcia timely appealed.

## II

### A

Mr. Garcia challenges the district court's relevant-conduct finding. Before we turn to the merits of this issue, however, we consider the appropriate standard of review, as we have only "limited power" to correct errors that were forfeited in the district court. *United States v. Olano*, 507 U.S. 725, 731 (1993); *see also United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014) (applying "rigorous" plain-error standard of review to forfeited errors); *accord* FED. R. CRIM. P. 52(b). Mr. Garcia acknowledges that the district court's

relevant-conduct finding is reviewable only for plain error because he did not

object to this finding.  *See* Aplt.'s Opening Br. at 8.[4]

---

[4]    Curiously, in connection with discussing the standard of review, Mr. Garcia notes that he "did object to the addition of two criminal history points for committing the instant offense while under a criminal justice sentence," and the propriety of applying those points "involves a legal question of guideline interpretation," which "is reviewed *de novo*."  Aplt.'s Opening Br. at 8–9. Relatedly, he purports to concede that he is subject to the plain-error standard of review concerning the district court's imposition of a two-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(A) for an offense involving three or more firearms—which was based on the district court's determination that the two handguns discovered in Mr. Garcia's possession in April 2016 were relevant conduct—because he did not object to this enhancement.  But as clearly evident from Mr. Garcia's framing in his opening brief of his issues on appeal and his comments at oral argument, Mr. Garcia fully understands that, with respect to the district court's Guidelines rulings, the sole issue before us is whether the court erred in its relevant-conduct determination, and our review of that issue is for plain error because Mr. Garcia did not object to this determination.  *See, e.g.*, *id.* at 2 (describing the Guidelines issue for appeal as "whether the district court plainly erred in finding that a 2016 arrest for felon in possession of a firearm . . . constituted relevant conduct" (capitalization omitted)).

To be sure, that relevant-conduct ruling "was used [by the court] to support," *inter alia*, its application of two criminal-history points under § 4A1.1(d) and the two offense levels under § 2K2.1(b)(1)(A), for an offense involving three or more firearms.  *Id.* at 15.  But, notably, before the district court and on appeal, the court's determination of that relevant-conduct predicate for these two enhancements has been the exclusive basis for Mr. Garcia's objection to them.  In other words, the gravamen of his objection to these two Guidelines enhancements is that they are based on an ostensibly flawed relevant-conduct determination.  Thus, it is not surprising that Mr. Garcia has not argued that the court's addition of these enhancements was improper for an independent, non-relevant-conduct reason.  More specifically, no such arguments adequate for our review appear in his opening brief with respect to the addition of these enhancements.  *See, e.g.*, *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . .

(continued...)

14

Because we review only for plain error, Mr. Garcia must show "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights." *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012) (quoting *United States v. Cooper*, 654 F.3d 1104, 1117 (10th Cir. 2011)). If Mr. Garcia satisfies these criteria, then under the fourth element of the plain-error test, we may exercise our discretion to correct the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *Cooper*, 654 F.3d at 1117); *see also United States v. Gonzalez-Huerta*, 403 F.3d 727, 736 (10th Cir. 2005) (en banc) (underscoring that the party seeking relief under the plain-error rubric bears the burden of satisfying its elements).

With regard to the standard's first inquiry—whether there was error at all—the parties dispute the question of whether relevant conduct is an issue of law, reviewed de novo, or an issue of fact, reviewed for clear error. *See* Aplt.'s

---

[4](...continued)
."). Put another way, his objections to these two enhancements are entirely subsidiary to, and derivative of, his objection on appeal to the court's relevant-conduct determination. As his counsel candidly acknowledged at oral argument, Mr. Garcia's objections to these enhancements will "stand or fall" with his objection to the court's relevant-conduct ruling. Oral Arg. 3:05–3:07. Therefore, we need not conduct an independent, standard-of-review analysis with respect to the district court's rulings concerning these two enhancements. The only Guidelines ruling truly before us relates to the district court's determination that the April 2016 incident is relevant conduct with respect to the April 2017 incident, which formed the basis for Mr. Garcia's felon-in-possession conviction. And the standard of review for that issue is plain error.

Opening Br. at 9 (arguing for de novo review); Aplee's Resp. Br. at 13 n.2 ("[T]he proper standard for reviewing whether a district court's relevant conduct determination was valid is normally clear error, as such a determination is a factual finding."). Unfortunately, "[t]he answer to this question has perplexed this Court. . . . [and] [w]e have been inconsistent in our decisions" concerning it. *United States v. Craig*, 808 F.3d 1249, 1255 (10th Cir. 2015). We need not delve into this matter further, however. Instead, we are content to "give [Mr. Garcia] the benefit of the doubt and assume for the purposes of this appeal that a district court's ultimate determination of relevant conduct is a legal conclusion we review de novo." *Id.* This is so because, irrespective of the character of this ultimate relevant-conduct determination, Mr. Garcia's challenge here turns on whether the record provides a proper foundation for certain subsidiary "factual findings in support of a determination of relevant conduct." *United States v. Griffith*, 584 F.3d 1004, 1012 (10th Cir. 2009). And it is undisputed that ordinarily (absent forfeiture) we must review those findings only for clear error. *Id.*; *accord United States v. Smith*, 705 F.3d 1268, 1274 (10th Cir. 2013); *see Craig*, 808 F.3d at 1255 ("Even under this assumption [that relevant conduct is a question of law], we must still review for clear error the district court's factual findings supporting its determination of relevant conduct.").

16

As to the plain-error rubric's second inquiry, we have held that an error is clear or obvious if "it is contrary to well-settled law." *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000); *accord United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th Cir. 2012). And "[i]n general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003); *accord United States v. Thornburgh*, 645 F.3d 1197, 1208 (10th Cir. 2011). Lastly, as to the third inquiry, ordinarily when we say that "the error affects substantial rights . . . [that] 'usually means that the error must have affected the outcome of the district court proceedings.'" *Gonzalez-Huerta*, 403 F.3d at 732–33 (quoting *United States v. Cotton*, 535 U.S. 625, 632 (2002)); *accord United States v. Pablo*, 696 F.3d 1280, 1293 (10th Cir. 2012).

**B**

We now turn to the merits of Mr. Garcia's relevant-conduct argument. Mr. Garcia's argument concerns the application of Guidelines § 1B1.3, entitled "Relevant Conduct," and particularly its instruction that, as to "offenses of a character for which [Guidelines] § 3D1.2(d) would require grouping of multiple counts," relevant conduct includes "all acts or omissions . . . that were part of the *same course of conduct* . . . as the offense of conviction." U.S.S.G. § 1B1.3(a)(2) (emphasis added). Significantly, § 3D1.2(d) requires the grouping of multiple

17

counts of offenses that § 2K2.1 covers.  And § 2K2.1 is applicable to Mr.

Garcia's offense of conviction under 18 U.S.C. § 922(g)(1).  *See id.* § 3D1.2(d).

Therefore, the court was obliged to apply the same-course-of-conduct standard

here.  This standard is a factual one, and, consequently, a court's same-course-of-

conduct determination ordinarily (absent forfeiture) would be reviewed only for

clear error.  *See, e.g.*, *United States v. Svacina*, 137 F.3d 1179, 1185 (10th Cir.

1998) ("We hold that the court's factual finding that Defendant's possession of

methamphetamine in August 1995 was part of the same course of conduct as the

offense of conviction is not clearly erroneous."); *United States v. McKneely*, 69

F.3d 1067, 1079 (10th Cir. 1995) ("The district court's determination that the

cocaine seized in Utah was involved in the same course of conduct as the offense

of conviction was not clearly erroneous.").

According to an application note to § 1B1.3, offenses are part of the same

course of conduct if they "are sufficiently connected or related to each other as to

warrant the conclusion that they are part of a single episode, spree, or ongoing

series of offenses."  U.S.S.G. § 1B1.3 cmt. n.5(B)(ii).  The note continues as

follows:

> Factors that are appropriate to the determination of whether
> offenses are sufficiently connected or related to each other to
> be considered as part of the same course of conduct include
> *the degree of similarity of the offenses, the regularity
> (repetitions) of the offenses, and the time interval between the
> offenses*. When one of the above factors is absent, a stronger

18

presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

*Id.* (emphasis added).

We have opined that this same-course-of-conduct standard "looks to whether the defendant repeats the same type of criminal activity over time," but "does not require that acts be 'connected together' by common participants or by an overall scheme." *United States v. Roederer*, 11 F.3d 973, 979 (10th Cir. 1993) (quoting *United States v. Perdomo*, 927 F.2d 111, 115 (2d Cir. 1991)).[5] "It

---

[5] Mr. Garcia observes that both *Roederer* and *United States v. Richards*, 27 F.3d 465 (10th Cir. 1994), were decided prior to a 1994 amendment to the Guidelines commentary which "specifically directed courts to consider similarity, regularity and time interval separately, and to require a stronger presence of one when another factor is absent." Aplt.'s Reply Br. at 10 n.1. He does not argue, however, that these cases are inapposite as to all matters arising in the relevant-conduct context. Indeed, he relies on *Roederer*'s analysis of one of the three factors. *See* Aplt.'s Opening Br. at 13. Moreover, our cases after 1994 have continued to cite *Roederer* and *Richards* for other relevant-conduct principles. *See, e.g., United States v. Caldwell*, 585 F.3d 1347, 1350–51 (10th Cir. 2009); *see also United States v. Niles*, 708 F. App'x 496, 504 (10th Cir. 2017) (unpublished). Therefore, although we do not rely on *Roederer* and *Richards* for principles directly relating to the existence of an obligation of sentencing courts to consider the three factors and the specified methodology for weighing the factors, we rely on the cases for other, more general principles

(continued...)

focuses instead on whether [a] defendant has engaged in an identifiable '*behavior pattern*' . . . of specified criminal activity." *Id.* (emphasis added) (quoting *Perdomo*, 927 F.2d at 115). Morever, "each case depends largely on its own facts." *Id.* (quoting *United States v. Santiago*, 906 F.2d 867, 872 (2d Cir. 1990)).

Here, the parties dispute the presence and strength of each of the three application-note factors—that is, the degree of similarity of the offenses, the regularity or repetition of the offenses, and the temporal proximity of the offenses. For the reasons explicated below, we conclude that, with respect to the district court's relevant-conduct determination, Mr. Garcia cannot establish reversible error under the plain-error standard.[6]

**1**

Mr. Garcia first argues that the two instances of possession were "factually dissimilar." Aplt.'s Opening Br. at 12. That is, during the April 2016 incident, he possessed handguns on his person and outside his home, there was no evidence that he was "using" the guns when he was apprehended, and he was compliant

---

[5](...continued)
germane to the relevant-conduct determination.

[6]     Mr. Garcia is correct that the district court did not individually address the three factors and expressly balance them against each other. *See* Aplt.'s Opening Br. at 11–12. Under similar circumstances, however, we have ruled that a district court's failure to make "specific findings" on the factors is not fatal in light of our ability to affirm on any ground supported by the record. *See Richards*, 27 F.3d at 468 (citing *Roederer*, 11 F.3d at 977).

when officers asked to speak with him.  *Id.*  On the other hand, during the April 2017 incident, the firearm was found at Mr. Garcia's home and his girlfriend "gave inconsistent stories about whether Mr. Garcia actually had his rifle out, or whether it had always been under the bed."  *Id.*; *see also* Aplt.'s Reply Br. at 4 (arguing that "the only similarity" between the incidents was "the name of the charge and the name of the defendant").

The government argues otherwise, relying principally on *United States v. Windle*, 74 F.3d 997 (10th Cir. 1996).  There, we rejected a defendant's argument that possession of other firearms was not relevant conduct to a felon-in-possession charge, observing succinctly that "the offenses were not merely similar but identical."  *Id.* at 1000.  The government also notes that both offenses occurred in Oklahoma City, *see, e.g.*, *United States v. Caldwell*, 585 F.3d 1347, 1353 (10th Cir. 2009) (finding similarity present for producing and selling crack cocaine where, *inter alia*, "all three instances of Mr. Caldwell's conduct of conviction and all three instances of his relevant conduct took place in the same city in Kansas"), and that in both instances the guns were "loaded and ready to be fired," Aplee.'s Resp. Br. at 16.

Having considered the parties' arguments here, we conclude that Mr. Garcia has failed to establish the "factual dissimilarity" that he alleges.  More specifically, we conclude that he has not established error—much less clear or

obvious error—concerning a judicial finding of similarity. Notably, he has not offered us any legal authority that indicates that the fine distinctions that he draws between the precise location where the firearms were possessed, his use of the firearms, and his compliance with law enforcement are distinctions with a material difference on the question of similarity. On the other hand, our decision in *Windle* appears to forcefully undercut Mr. Garcia's similarity argument. *Windle* may be reasonably read as holding that, in connection with a felon-in-possession crime, a defendant's additional instances of illegal firearm possession may be found to be "not merely similar but identical," 74 F.3d at 1000, to the offense of conviction—without the need for a sentencing court to engage in a detailed analysis of the factual circumstances of each possession.

Mr. Garcia's attempts to diminish the potency of *Windle* are unpersuasive. In this regard, Mr. Garcia contends that *Windle* engaged in "little analysis" and failed to discuss "the circumstances under which the individual guns were possessed" or to expressly weigh the three factors.[7] *See* Aplt.'s Reply Br. at 5.

---

[7] Mr. Garcia also states that "the only objection the defendant [in *Windle*] appeared to lodge was to the sufficiency of the proof of his previous firearms possessions, a point he later conceded." Aplt.'s Reply Br. at 5. This is an untenably narrow reading of *Windle*. To be sure, the court there first addressed whether the government had adequately proven that the offense "involved five firearms," noting that defense counsel had basically conceded this issue at argument. 74 F.3d at 1000. But then the court went on to analyze the defendant's contention that "the possession of the firearms

(continued...)

22

But, as noted, *Windle* is reasonably read as not requiring sentencing courts to parse the factual circumstances under which individual guns are possessed in reaching similarity determinations, and the mere fact that *Windle*'s analysis is brief does not mean that it is not cogent and entirely congruent with the concerns of § 1B1.3, and we conclude that it is.

Furthermore, stepping beyond *Windle*, several of our cases have ruled that allegedly relevant conduct can differ in meaningful respects from the conduct giving rise to a conviction without rendering the respective sets of conduct "factually dissimilar" from one another. *See Caldwell*, 585 F.3d at 1353 ("To be sure, there were also some differences between Mr. Caldwell's conduct of conviction and his relevant conduct. For example, Mr. Caldwell's role in the conduct of conviction (distributor) differed from his role in the relevant conduct (producer). Further, the amount involved in the relevant conduct was greater than the amount involved in the conduct of conviction. . . . These differences do not undercut the substantial similarities between his conduct of conviction and his additional relevant conduct."); *see also United States v. Moore*, 130 F.3d 1414, 1418 (10th Cir. 1997) ("In Moore's case, the record shows substantial similarity

---

[7](...continued)
[was] not relevant conduct." *Id.* Significantly, the *Windle* defendant had not specifically conceded the issue of similarity. Therefore, his objection to a finding of relevant-conduct would necessarily have put the issue of similarity in play and required the court to resolve it.

23

between his nine-ounce crack deal in September 1992 and the smaller deals that comprised the earlier conspiracy[.] . . . Although the amount of crack in the September 1992 [deal] was larger than ever before, this difference does not outweigh the rest of the similarities with the earlier activities."). Therefore, the fine distinctions that Mr. Garcia draws between the April 2016 event and the April 2017 offense of conviction do not avail him.

We thus conclude that Mr. Garcia's arguments do not permit him to cross the threshold of showing that a similarity determination would constitute error. But, even if he had succeeded in crossing the error threshold, given the absence of any controlling, on-point caselaw favorable to his cause, Mr. Garcia could not establish that any similarity finding was clear or obvious error.[8] Therefore, the

---

[8] Mr. Garcia's relevant-conduct argument relies in substantial part on the Sixth Circuit's decision in *United States v. Amerson*, 886 F.3d 568 (6th Cir. 2018), which found that the relevant-conduct test not satisfied where, *inter alia*, the guns that were the subject of a felon-in-possession conviction and the guns that were possessed as allegedly relevant conduct were possessed at different times and under different factual circumstances. Aplt.'s Opening Br. at 14–15. However, as *Ruiz-Gea*'s holding makes clear, 340 F.3d at 1187, a single decision from one of our sister circuits ordinarily is no moment on the question of whether the district court clearly or obviously erred, *see, e.g.*, *United States v. Schneider*, 704 F.3d 1287, 1304 (10th Cir. 2013) (Holmes, J., concurring, joined by Martinez, J., to constitute a majority) (noting that "[g]enerally" the absence of Supreme Court or Tenth Circuit authority "will close the door on a claim that the error at issue is clear or obvious"). Furthermore, *Amerson* is distinguishable at least on the question of whether the district court clearly or obviously erred here because it was not decided under the plain-error rubric. *See* 886 F.3d at 573 (reviewing the district court's relevant-conduct determination de novo and

(continued...)

24

similarity factor does not support his challenge to the district court's relevant-conduct determination.

**2**

"'To determine whether "regularity" is present, we inquire whether there is evidence of a regular, i.e., repeated, pattern of similar unlawful conduct' *between* 'the purported relevant conduct and the offense of conviction.'" *United States v. Damato*, 672 F.3d 832, 841 (10th Cir. 2012) (emphasis added) (quoting *United States v. Rhine*, 583 F.3d 878, 889–90 (5th Cir. 2009)).

Mr. Garcia argues that "[t]he only two incidents occurred 362 days apart, and there were no intervening instances of firearms possession on which the [district] court relied."[9] Aplt.'s Opening Br. at 12. According to Mr. Garcia, "[c]ourts have found that where only two separate incidents are at issue, there is not a significant degree of regularity." *Id.* at 12–13. But, citing our decision in *Svacina*, the government argues that two incidents are enough to demonstrate

---

[8](...continued)
observing that it was the government's burden to prove that another offense was relevant conduct).

[9] Mr. Garcia acknowledges that the PSR identified other instances of firearm possession, but he contends that these occurred in the mid-1990s and in 2008—many years prior to the events of this case. *See* Aplt.'s Opening Br. at 12 n.3; Aplt.'s Reply Br. at 8. The government does not advance these instances in support of a showing of regularity, *see* Aplee.'s Resp. Br. at 16–17, and we do not rely on them in our analysis.

25

regularity. *See* Aplee's Resp. Br. at 16. *Svacina*'s discussion of the regularity issue is brief. *See* 137 F.3d at 1183. However, in considering there whether a dismissed drug count qualified as relevant conduct to the drug offense of conviction, we stated, "[a] comparison of the dismissed count with the count of conviction also shows that some regularity of conduct exists—the minimum requirement of two instances of conduct." *Id.* Quite apart from *Svacina*, moreover, the government challenges the factual premise of Mr. Garcia's argument—specifically, the belief that there are only two incidents at issue in the regularity analysis—i.e., the firearm incidents of April 2016 and April 2017. The government points out that Mr. Garcia's girlfriend told law enforcement that he had "the rifle out" six months prior to the April 2017 incident, R., Vol. II, ¶ 8, at 6, and that a plausible inference from her statement was that Mr. Garcia continuously possessed the rifle on each and every day during the six-month period preceding the April 2017 incident—that is, for a six-month period falling *between* the alleged relevant conduct and the crime of conviction—even if he did not bring the rifle out, *see* Aplee.'s Resp. Br. at 17; *see id.* at 10 (noting that the girlfriend "reported seeing Mr. Garcia with the rifle six months earlier, indicating that Mr. Garcia had continuously been possessing illegal firearms for at least half of the previous year").

26

In our view, the government has the better position. We would be hard pressed on these facts to conclude that a finding of regularity constitutes error, let alone clear or obvious error. We need not opine on whether *Svacina*'s language actually stands for the proposition that two incidents of unlawful conduct, standing alone, can display sufficient regularity. This is so because we conclude that the district court would not have erred in rejecting Mr. Garcia's reading of the record with respect to the regularity factor, which limited the universe of unlawful incidents to two—i.e., the two instances of unlawful possession of firearms occurring in April 2016 and April 2017. In particular, as the government suggests, the district court would not have erred in finding based on the statements of Mr. Garcia's girlfriend that he unlawfully possessed a firearm each and every day for a six-month period "between 'the purported relevant conduct and the offense of conviction.'" *Damato*, 672 F.3d at 841 (quoting *Rhine*, 583 F.3d at 890). And, given that "repeated, pattern of similar unlawful conduct," *id.*, we think it beyond dispute that the district court would not have erred in determining that there was ample evidence to support a finding of regularity.

To be sure, Mr. Garcia vigorously objects to our consideration of the girlfriend's statement. Specifically, Mr. Garcia urges us to disregard his girlfriend's statement because the district court did not refer to it at sentencing, making only a "general reference" to Mr. Garcia's "continuous course of

27

conduct." *See* Aplt.'s Reply Br. at 8.  Further, Mr. Garcia contends that his girlfriend's six-months-prior statement concerning his purported display of the rifle was made at the same approximate time she was "directly contradicting her earlier statement that Mr. Garcia had his gun out on the date of the charged incident"—a retraction that "law enforcement disbelieved." *Id.*  We do not find these arguments offer a cogent basis for disregarding the girlfriend's statement.

First, the fact that the district court did not specifically reference the girlfriend's statement stands as no obstacle to our considering it in affirming the court's ultimate relevant-conduct determination.  In this regard, it is axiomatic that ordinarily we may affirm on "any ground that finds support in the record." *United States v. Richards*, 27 F.3d 465, 468 (10th Cir. 1994); *accord Richison v. Ernest Grp.*, 634 F.3d 1123, 1130 (10th Cir. 2011).  Furthermore, it would be particularly imprudent to infer from the absence of a discussion by the court concerning the girlfriend's statement that the court did not rely on it, where it is undisputed that Mr. Garcia did not challenge the court's relevant-conduct determination and, consequently, did not give the court any reason to develop a record with some particularity regarding the variables underlying its determination.  *Cf. United States v. Howard*, 784 F.3d 745, 749 (10th Cir. 2015) ("[F]actual disputes regarding sentencing not brought to the attention of the

28

district court do not rise to the level of plain error.") (quoting *United States v. Lewis*, 594 F.3d 1270, 1288 (10th Cir. 2010)); *accord Svacina*, 137 F.3d at 1187.

Second, Mr. Garcia's attack on his girlfriend's credibility does not advance his cause. He reasons that, if the police did not believe the girlfriend's retraction regarding Mr. Garcia's having the firearm visible on the day of the April 2017 incident, there was not a proper factual basis for the district court to find that her related statement about his possession of the firearm six months prior was credible. However, although Mr. Garcia's girlfriend retracted her statement about the rifle being visible during the April 2017 incident, officers believed she was "reluctant to tell them the whole truth" because she was "frightened about what [Mr. Garcia] might do to her." R., Vol. II, ¶ 8, at 6. One might reasonably infer from this that the girlfriend was motivated by a desire to *downplay* Mr. Garcia's criminal conduct when she spoke to the police and that her retraction was a product of this motivation.

As such, it would be inconsistent with this motivation for the girlfriend to fabricate a story involving Mr. Garcia's possession of the rifle six months prior in order to *inculpate* him. Such a reading of the record would be questionable at the very least. It seems much more likely that when the girlfriend told the police about Mr. Garcia's prior possession of the rifle, she was offering them, as she perceived it, the most benign version of the facts concerning his possession of a

29

firearm—one suggesting that he had not displayed a firearm during a domestic-violence incident. Thus, the district court would not have erred in deeming the girlfriend's statement credible and crediting it in assessing the regularity factor.

We underscore that we need not decide that the *only* plausible reading of the record would involve crediting the girlfriend's statement. It is enough that crediting this statement is consistent with *a* plausible reading of the record. *See, e.g.*, *United States v. Piper*, 839 F.3d 1261, 1271 (10th Cir. 2016) ("If the 'court's account of the evidence is plausible in light of the record viewed in its entirety,' we may not reverse it even if we might have weighed the evidence differently." (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985))); *see also United States v. Cortes-Gomez*, 926 F.3d 699, 708 (10th Cir. 2019) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quoting *Anderson*, 470 U.S. at 574)). And we conclude that this reading is plausible. Consequently, the district court—based on the girlfriend's statement—would not have erred in finding that Mr. Garcia unlawfully possessed a firearm each and every day for a six-month period "*between* 'the purported relevant conduct and the offense of conviction.'" *Damato*, 672 F.3d at 841 (emphasis added) (quoting *Rhine*, 583 F.3d at 890). And this finding would have provided ample evidence for a regularity

30

determination. Therefore, the district court did not commit error here, let alone clear or obvious error.[10]

**3**

Finally, Mr. Garcia argues that the time interval between the events of April 2016 and April 2017 was too great to support a finding of relevant conduct.

---

[10]It bears noting that even were we to accept Mr. Garcia's reading of the record—wherein there are only two unlawful firearms incidents that are separated by a little less than one year (i.e., in April 2016 and April 2017)—and even were we to conclude that the district court erred in its regularity determination, Mr. Garcia's showing of clear or obvious error would come up short. Mr. Garcia does not direct us to any *controlling* authority that has refused to find regularity under similar circumstances because there were only two unlawful incidents. Instead, he relies on (1) a Sixth Circuit case, (2) an unpublished District of New Mexico case, and (3) two Tenth Circuit cases, i.e., *Windle* and *Roederer*, where regularity *was* present based on five or eight instances of conduct, respectively. This authority does *not* establish that the district court would have clearly or obviously erred on the regularity question. First of all, the cited Tenth Circuit cases lend Mr. Garcia no succor. The fact that more than two instances of unlawful conduct were *sufficient* in *Windle* and *Roederer* to establish regularity says virtually nothing about whether more than two instances would be *necessary* to show regularity. *See, e.g.*, *United States v. Burkholder*, 816 F.3d 607, 620 n.10 (10th Cir. 2016) ("An event or condition is *sufficient* if its existence means that another event or condition will occur. An event or condition is *necessary* if, in its absence, another event or condition could not occur."). Neither by their express terms nor, as a matter of simple logic, do these cases stand for the latter proposition (i.e., that more than two instances is necessary). Moreover, as set forth previously, ordinarily only Supreme Court or Tenth Circuit precedent can define well-settled law for purposes of the clear-or-obvious standard of the plain-error test, so Mr. Garcia's reliance on cases from the Sixth Circuit and the New Mexico district court do not avail him. In sum, even were we to accept Mr. Garcia's view of the record, and conclude that the district court's decision reflects an erroneous finding regarding the regularity factor, Mr. Garcia would not be able to make a showing of clear or obvious error.

Aplt.'s Opening Br. at 13.  The government argues that this court has not set a bright-line rule to follow in evaluating this factor but the "general rule appears to be that offenses occurring within six months of each other have a strong temporal link and temporal proximity is sufficient for offenses occurring up to five years apart if evidence of the other two factors is also present."  *See* Aplee.'s Resp. Br. at 18–20.

Our most in-depth analysis of temporality came in *Damato*, where we considered allegedly relevant conduct that predated the offense conduct by over thirteen years:

> None of the cases cited by the government contain such a lengthy gap between potentially relevant conduct and the crime of conviction, nor have we discovered any in our independent research. In fact, we have been unable to uncover a case holding that conduct even half as temporally distant qualifies as relevant conduct. The largest time difference we have observed in the case law is the five-year interval at issue in *Roederer*, 11 F.3d 973.

> Further, the five-year delay in *Roederer* appears to be an outlier. We have described a "fifteen month interval" as "temporally distant." *United States v. Clark*, 415 F.3d 1234, 1242 (10th Cir. 2005).  Other circuits have held that temporal gaps as brief as five months cut against a finding that an activity was part of the same course of conduct as the offense of conviction.  *See United States v. Hahn*, 960 F.2d 903, 910–11 (9th Cir. 1992) (five-month gap is "relatively remote"); *See also United States v. McGowan*, 478 F.3d 800, 802 (7th Cir. 2007) (eight-month "gap is long enough to cast doubt on the relevance of the earlier conduct"); *United States v. Ortiz*, 431 F.3d 1035, 1041 (7th Cir. 2005) (ten-month "gap

32

suggests the lack of a common plan or course of conduct"); *United States v. Mullins*, 971 F.2d 1138, 1144 (4th Cir. 1992) (temporal proximity factor "extremely weak . . . if present at all, as the uncharged conduct took place over six months prior to the two phone calls underlying the offense of conviction"). And courts have repeatedly held that temporal proximity is lacking or that conduct is very remote when the interval exceeds one year. *See United States v. Kulick*, 629 F.3d 165, 171, 172 (3d Cir. 2010) (twenty-seven month interval is "substantial" and "temporally remote"); *[United States v.] Hill*, 79 F.3d [1477,] 1484 [(6th Cir. 1996)] ("[W]e find that temporal proximity is extremely weak in that nineteen months is an exceedingly long lapse between offenses."); *United States v. Sykes*, 7 F.3d 1331, 1337 (7th Cir. 1993) (temporal gap of fourteen months "tends to indicate conduct that can easily be separated into discrete, identifiable units rather than behavior that is part of the same course of conduct" (quotation omitted)).

The Fifth Circuit accurately summarized the bulk of the case law in stating: "Various courts have found that a period of separation of *over one year* negated or weighed against [a finding of] temporal proximity." *United States v. Wall*, 180 F.3d 641, 646 (5th Cir. 1999). With this consensus in mind, it clearly follows that the thirteen-year interval between the 1990 transaction and Damato's offense of conviction is extraordinary. Given this extreme lack of temporal proximity, the 1990 transaction may not be treated as relevant conduct unless one of the other factors—regularity or similarity—is "authoritatively present." *United States v. Miller*, 179 F.3d 961, 967 n. 10 (5th Cir. 1999); *See* U.S.S.G. § 1B1.3 app. n.9(B) ("When one of the above factors is absent, a stronger presence of at least one of the other factors is required.").

672 F.3d at 840–41 (emphasis added) (footnote omitted).

Even under the reading of the record most favorable to Mr. Garcia—which we accept for purposes of analyzing the temporal-proximity factor—the operative

33

gap of time is a little less than one year, specifically, the period between the April

2016 incident and the April 2017 offense of conviction.[11]  Guided by *Damato*, we

have no difficulty concluding that, at the very least, the district court would not

have clearly or obviously erred in finding that this gap was *not* too remote.  In

other words, it would not have been clear or obvious error for the court to find

that the temporal gap between the two events was sufficiently close to support a

same-course-of-conduct determination.

In particular, Mr. Garcia has cited no controlling precedent from the

Supreme Court or the Tenth Circuit that establishes that a temporal gap of nearly

one year would eviscerate, as a matter of law, a showing of temporal proximity.

And we are not aware of any.  This effectively sounds the death knell for his

temporal-proximity challenge on plain-error review.  *See Ruiz-Gea*, 340 F.3d at

---

[11]     The government briefly suggests that the relevant temporal gap may be less than one year because the "evidence indicates that [Mr. Garcia] continued to illegally possess firearms less than six months after his 2016 arrest."  Aplee.'s Resp. Br. at 20.  Presumably, the government is alluding to the testimony of Mr. Garcia's girlfriend that Mr. Garcia had "the rifle out" six months prior to the April 2017 incident.  R., Vol. II, ¶ 8, at 6.  However, the government does not develop this argument, and it would be improper for us to flesh it out. Accordingly, we are disinclined to comment on the merits of it.  *Cf. United States v. Ray*, 899 F.3d 852, 858 (10th Cir. 2018) (ruling that party who "fails to develop or provide any authority" in support of his argument "waived" it), *cert. denied*, 139 S. Ct. 1206 (2019); *Sports Racing Serv., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 880 (10th Cir. 1997) (deeming "waived" claims that plaintiffs "never developed").  In any event, for reasons explicated *infra*, even under the view of the record most favorable to him, Mr. Garcia cannot prevail under the applicable plain-error standard.

34

1187; *accord Thornburgh*, 645 F.3d at 1208. But, making matters worse for Mr. Garcia, the federal circuit courts have no uniform view that is favorable to him concerning when the temporal gap is too wide to support a same-course-of-conduct determination. *See United States v. Wolfname*, 835 F.3d 1214, 1221 (10th Cir. 2006) ("[W]e agree that if neither this court nor the Supreme Court has directly addressed a particular issue, then a circuit split on that issue *weighs against a finding of plain error.*" (emphasis added)); *United States v. Teague*, 443 F.3d 1310, 1319 (10th Cir. 2006) ("If neither the Supreme Court nor the Tenth Circuit has ruled on the subject, we cannot find plain error *if the authority in other circuits is split.*" (emphasis added)). To the contrary, as *Damato* indicates, the "consensus" among our sister circuits actually undercuts Mr. Garcia's position because it only deems impermissible temporal gaps that *exceed* one year. 672 F.3d at 841. And, of course, under Mr. Garcia's reading of the record, the temporal gap here is a little *less* than one year.

We recognize that Mr. Garcia marshals our decision in *United States v. Cuthbertson*, 138 F.3d 1325 (10th Cir. 1998). There, we affirmed a district court's finding that a 1995 state sexual-battery offense was not relevant conduct to a 1994 federal conviction of transporting a juvenile in interstate commerce with intent to engage in criminal sexual activity because "these two acts occurred on different occasions, separated by a temporal gap of almost a year, and involved

35

'multiple, separate instances of fear and harm.'" *Id.* at 1327 (citing U.S.S.G. § 3D1.2 cmt. n.4). However, the *Cuthbertson* panel expressly ruled that the same-course-of-conduct framework was not applicable in that case because the defendant's federal offense was not groupable and, thus, took a different analytical route through the relevant-conduct rubric than we do here. *Id.* Therefore, *Cuthbertson* is inapposite.

In sum, even under his view of the record, Mr. Garcia cannot demonstrate that a finding of temporal proximity would constitute clear or obvious error.

**4**

Based on the foregoing analysis, we conclude that the district court did not commit reversible error under the plain-error rubric in determining that the April 2016 incident was relevant conduct with regard to the April 2017 incident—i.e., the incident giving rise to Mr. Garcia's felon-in-possession conviction. The Guidelines commentary contemplates that, if one of the three factors that it specifies is "absent" that courts may nevertheless determine that the conduct at issue is relevant conduct under the same-course-of-conduct standard, if there is "a stronger presence of at least one of the other factors." U.S.S.G. § 1B1.3 cmt. n.5(B)(ii); *see Damato*, 672 F.3d at 841 ("Given this extreme lack of temporal proximity, the 1990 transaction may not be treated as relevant conduct *unless one of the other factors—regularity or similarity—is 'authoritatively present.'*"

36

(emphasis added) (quoting *Miller*, 179 F.3d at 967 n.10)).  However, we have no need to conduct such a strong-presence assessment here because, at the very least, the district court would not have clearly or obviously erred in finding that all three factors were *present*.

In sum, concerning the district court's relevant-conduct determination, Mr. Garcia cannot demonstrate, as he must, that the court erred under the plain-error rubric.  Therefore, we reject this challenge to the court's sentence.  We now turn to Mr. Garcia's remaining sentencing challenge.

### III

Mr. Garcia also argues that his ninety-six-month sentence is substantively unreasonable.  We review a sentence "for reasonableness, giving deference to the district court under 'the familiar abuse-of-discretion standard.'"[12]  *United States v. Gambino-Zavala*, 539 F.3d 1221, 1227 (10th Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 46 (2007)).  More specifically, "[r]eview for substantive reasonableness focuses on whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Sample*, 901 F.3d 1196, 1199 (10th Cir. 2018) (quoting *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009)), *cert.*

---

[12]     A defendant need not object in district court to mount a substantive-reasonableness challenge on appeal.  *United States v. Vasquez-Alcarez*, 647 F.3d 973, 976 (10th Cir. 2011).

*denied*, 139 S. Ct. 1545 (2019); *accord United States v. Barnes*, 890 F.3d 910, 915 (10th Cir. 2018).

We will find an abuse of discretion only if the sentence "exceeded the bounds of permissible choice," *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007) (quoting *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)); that is, a defendant must show that the sentence was "arbitrary, capricious, whimsical, or manifestly unreasonable," *United States v. DeRusse*, 859 F.3d 1232, 1236 (10th Cir. 2017) (quoting *United States v. Gantt*, 679 F.3d 1240, 1249 (10th Cir. 2012)); *cf. Gall*, 552 U.S. at 51 (noting the district court's "superior position to find facts and judge their import under § 3553(a)").

"We do not apply 'a rigid mathematical formula that uses the percentage of a departure [or variance] as the standard for determining the strength of the justifications required for a specific sentence.'" *Sample*, 901 F.3d at 1199 (quoting *Gall*, 552 U.S. at 47). However, the magnitude of the variance "remains a *consideration* on appeal." *United States v. Smart*, 518 F.3d 800, 807 (10th Cir. 2008); *see also Gall*, 552 U.S. at 50 (describing it as "uncontroversial that a major departure should be supported by a more significant justification than a minor one").

Mr. Garcia challenges on two grounds the substantive reasonableness of his ninety-six-month sentence (recall that the Guidelines range was forty-six to fifty-

seven months' imprisonment).[11]  First, he contends that the district court relied "central[ly]" on "its view of [his] criminal history as continuous and violent." *See* Aplt.'s Opening Br. at 19.  However, this assessment is not supported by the record.  As Mr. Garcia reasons, his "troubling violent criminal episodes" were limited to his teenage years, and, within the fifteen years preceding his instant offense, his only non-traffic-related convictions were for drug possession and possession of stolen firearms.  *Id.* at 19–20.  He contends that, in taking into consideration the crimes from Mr. Garcia's "teenaged years" and early adulthood, in formulating  its characterization of his history as "violent," the district court

_____

[11]  Because we have rejected Mr. Garcia's arguments concerning the calculation of the Guidelines range, then the range that the court calculated and the actual sentence that the court ultimately imposed are the relevant comparators. We also observe that, although Mr. Garcia characterizes his actual sentence as "more than twice" or "more than double" a *low-end* Guidelines sentence, Aplt.'s Opening Br. at 18, 21, we typically compare the *high* end of the Guidelines range to the actual sentence imposed in doing our substantive-reasonableness analysis, *see United States v. Valtierra-Rojas*, 468 F.3d 1235, 1240 (10th Cir. 2006) ("Looking to only the percentage of the divergence – 122% above the high end of the range – the sentence might seem extreme."); *United States v. Mateo*, 471 F.3d 1162, 1170 (10th Cir. 2006) ("Here, the District Court increased Mr. Mateo's sentence by 471% above the high end of the advisory range of 21 months—more than eight years longer than he would serve if he was sentenced in accordance with the advisory Guidelines."); *United States v. Bishop*, 469 F.3d 896, 908 (10th Cir. 2006) ("The comparative difference between Mr. Bishop's sentence of 78 months and the advisory range maximum of 57 months is a 37% increase."), *overruled in part on other grounds by Gall*, 552 U.S. at 47, *as recognized by United States v. Joel Miller*, 891 F.3d 1220, 1234 (10th Cir. 2018).  Here, the district court's sentence exceeded the high end of the Guidelines range by thirty-nine months—that is, an increase of approximately sixty-eight percent over the high end of Guidelines range.

effectively expressed "a policy disagreement" with the Guidelines, which limit

how far back a sentencing court can go in assigning criminal-history points to

"convictions for purposes of recidivist enhancements." *Id.* at 20. Consequently,

he contends that the court's variance—which ostensibly is "grounded in" this

disagreement—"should be subject to a heightened level of review."[12] *Id.* (citing

*United States v. Lente*, 323 F. App'x 698, 715 (10th Cir. 2009) (per curiam)

(unpublished) (Holmes, J., concurring) (noting that, "in some instances," Supreme

Court authority holds that "decisions of sentencing courts to deviate from the

Guidelines based upon policy disagreements will be subject to a heightened level

of review"), *abrogated on other grounds by United States v. Story*, 635 F.3d 1241

(10th Cir. 2011)).

We are unpersuaded. Mr. Garcia overstates the importance that the district

court attached to the remote, violent events in his criminal history. Indeed, the

court did not have to rely on remote events to validate its concern that Mr. Garcia

was prone to violence and, on this basis, a danger to the public. Indeed, Mr.

Garcia's April 2017 arrest, which formed the basis for his conviction, occurred

---

[12]      In his reply brief, Mr. Garcia shifts position, contending that the
district court's policy disagreement was with the stringent requirements to qualify
for a fifteen-year mandatory-minimum sentence under the ACCA and that "the
district court's disagreement with these limitations does not provide a valid basis
for a variance." Aplt.'s Reply Br. at 13. We deem this "late-blooming
argument," however, to be waived. *Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir.
2007).

during a "relatively violent episode" where a firearm was present and he appeared to be either "planning for" or "at least equipped for" a shootout. R., Vol. III, at 62–63.

Moreover, the true central focus of the court's analysis was Mr. Garcia's longstanding, flagrant, and serious disregard for the law and, more specifically, the fact that this lawlessness posed a particular danger to the public. As to that danger, the court noted Mr. Garcia's repeated, unlawful possession of inherently dangerous firearms and apparent mental-health problems. A brief excerpt of the court's remarks makes the point:

> [W]e have had multiple instances of [Mr. Garcia] dealing with guns over an extended period of time and all subsequent to an early felony conviction many years ago, [which] suggests to me that we have a very serious set of circumstances here because, as counsel for the [g]overnment has suggested, there has been *a long, more or less continuous history of law-breaking by [Mr. Garcia]*.

> But it appears that throughout virtually the entire period of his adult life, *when he's committed these other crimes, he's also had guns around*. So this circumstance here is, in my view, a very serious offense.

> I'm required to consider [Mr. Garcia's history]. The most pertinent thing, of course, is that he does have a long, pretty much continuous history of breaking the law, criminal convictions for one thing or another.

> . . . .

41

[Mr. Garcia] appears to have mental health issues of some sort, at least in the sense of anger management -- maybe more serious than that -- that also, I think, contributes to the seriousness of what we're dealing with here.

[The government] has mentioned the factor that I think is probably the most important of the statutory factors. In some cases, it's not the most important, *but here I think it probably is. That's the need to protect the public from further crimes of [Mr. Garcia]*.

*Id.* at 63–64 (emphases added).

Thus, as this quotation illustrates, the court's central focus was not Mr. Garcia's remote crimes of violence per se, but rather his longstanding pattern of flagrant and serious disregard for the law of which those crimes were a part. In that vein, although the court did expressly note that Mr. Garcia's criminal history indicated that "some of [his] convictions [were] for violent conduct," reflecting "a very serious streak of violent conduct," the court did not lose sight of the fact that these violent episodes were "a part of the broader range of criminal activity" that Mr. Garcia perpetrated over many years. *Id.*

Taking into consideration Mr. Garcia's longstanding pattern of flagrant and serious disregard for the law—frequently including his unlawful possession of firearms—and the record evidence (recounted *supra*) concerning his seemingly serious mental-health problems, we find that the district was not unreasonable in

reaching the conclusion that the public needed to be protected from Mr. Garcia by a lengthy term of imprisonment:

> So I think there is a substantial need to protect the public from the risk of further criminal activity of [Mr. Garcia], partly reflected by the repetitive nature of his criminal activity generally, *but also from the repetitive nature of these situations where he's illegally possessing a firearm and, in some cases, it appears, using it*. So all of that adds to the seriousness here.

*Id.* at 64–65 (emphasis added).

Furthermore, insofar as the district court did take into account, in imposing its upward variance, the fact that Mr. Garcia's Guidelines criminal-history score did not fully reflect the length and severity of his youthful criminal record, the court would not have been expressing a policy disagreement with the Guidelines. Indeed, the drafters of the Guidelines themselves have recognized that their criminal-history computation scheme may not always fully reflect the seriousness of an offender's criminal background and that, in such circumstances, action to elevate sentences above the otherwise applicable Guidelines range may be appropriate. U.S.S.G. § 4A1.3 ("If reliable information indicates that the defendant's criminal history category substantially *under-represents* the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure *may* be warranted." (emphases added)). Instead of disagreeing with the Guidelines, the court would

43

have been endeavoring to faithfully discharge its statutory responsibility to ensure, among other things, that Mr. Garcia's sentence has the effect of "protect[ing] the public from further crimes." 18 U.S.C. § 3553(a)(2)(C); *see United States v. Shaw*, 471 F.3d 1136, 1141 (10th Cir. 2006) ("[W]here the court concludes that the Guidelines inadequately reflect a defendant's criminal history or the seriousness of the offense, a deviation may be appropriate."); *see also United States v. Adams*, 751 F.3d 1175, 1183 (10th Cir. 2014) ("[I]nsofar as Defendant is contending that the district court improperly *varied* upward in increasing his sentence, our response can be brief. For the reasons expressed by the district court—particularly Defendant's history of repeated criminal offenses—his sentence satisfied the reasonableness standard for substantive review of a sentence."). Thus, Mr. Garcia's assertion that the district court effectively acted on a policy disagreement with the Guidelines is without merit, and we reject his related call for the application of a heightened level of review of the court's upward variance. In sum, for the foregoing reasons, we find Mr. Garcia's first argument unpersuasive.

His second argument fares no better. Relying on statistics from the United States Sentencing Commission, Mr. Garcia asserts that his sentence was "far outside the norm" and suggests that it creates an unwarranted disparity with nationwide sentences of offenders convicted of similar firearms offenses. Aplt.'s

Opening Br. at 22 (citing 18 U.S.C. § 3553(a)(6)); *see also id.* at 23 ("These statistics demonstrate that the upward variance in this case was both unusual and unusually long."). Specifically, referencing fiscal year 2017, Mr. Garcia highlights the following: (1) the median sentence for firearms offenders in the Tenth Circuit was forty months, with a mean sentence of fifty-nine months; (2) only sixty offenders, or one percent of all defendants sentenced in the Tenth Circuit, received any upward variance; and (3) nationally, the median sentencing increase above the Guidelines range for firearms defendants receiving a variance under § 3553 was twenty-one months, or 31.6 percent above the Guidelines range. *Id.* at 22.

It is unquestionably true that under § 3553(a)(6), a sentencing court must consider "the need to avoid unwarranted sentence disparities *among defendants with similar records who have been found guilty of similar conduct.*" 18 U.S.C. 3553(a)(6) (emphasis added). And we have specifically noted that "[t]he need to avoid unwarranted disparities is a critical sentencing factor." *United States v. Lente*, 647 F.3d 1021, 1039 (10th Cir. 2011) However, Mr. Garcia's statistics do not advance his cause.

Insofar as he relies on statistics stemming only from Tenth Circuit sentences, his argument plainly does not implicate the kind of disparities that § 3553(a)(6) seeks to avoid—that is, *nationwide* disparities. *See United States v.*

45

*Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) ("The purpose of the sentencing guidelines is 'to eliminate disparities among sentences nationwide.'" (quoting *United States v. Zapata*, 546 F.3d 1179, 1194 (10th Cir. 2008))); *accord Adams*, 751 F.3d at 1183; *Damato*, 672 F.3d at 848.

And, to the extent that he offers nationwide statistics, as the government rightly suggests, Mr. Garcia does not place them in a meaningful "context." Aplee.'s Resp. Br. at 27. Specifically, as its plain terms indicate, the pertinent comparators under § 3553(a)(6) are similarly situated defendants, and Mr. Garcia's bare national statistics do not shed light on the extent to which the sentences that the statistics pertain to involve defendants that are similarly situated to Mr. Garcia. *See, e.g.*, *United States v. Joubert*, 778 F.3d 247, 256 (1st Cir. 2015) ("By pointing to national statistics, Joubert compares the sentence for his unique offense to the average sentence for others convicted under the same federal statute. A range of conduct is covered under criminal statutes like 18 U.S.C. §§ 2251(a) [and] 2252A(a)(5)(B). This comparison is thus unhelpful for determining the substantive reasonableness of Joubert's sentence for his unique crime."). In particular, his national statistics do not reveal what percentage of those defendants have a similar criminal background to Mr. Garcia's—notably, whether those defendants have been involved in a similar longstanding pattern of

flagrant and serious lawbreaking, which not infrequently involved unlawful possession of inherently dangerous firearms.

Here, the district court correctly computed and carefully considered the Guidelines range and, in doing so, "necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Franklin*, 785 F.3d at 1371 (quoting *Gall*, 552 U.S. at 59); *accord United States v. Gantt*, 679 F.3d 1240, 1249 (10th Cir. 2012). And, in light of Mr. Garcia's extensive and troubling criminal history, we conclude that the court "reasonably believed that Defendant's criminal history was more serious than his guidelines range would indicate." *Adams*, 751 F.3d at 1183. Moreover, the court's explanation leaves us with no doubt that the length of the non-Guidelines sentence that it imposed on Mr. Garcia was reasonably calculated to be "sufficient, but not greater than necessary" to satisfy the sentencing considerations embodied in § 3553(a)(2), *see* 18 U.S.C. § 3553(a)—notably, the need "to protect the public from further crimes of [Mr. Garcia]," *id.* § 3553(a)(2)(C). In other words, we conclude that the district court did not abuse its discretion in sentencing Mr. Garcia and that his sentence is substantively reasonable.

## IV

In light of the foregoing, we reject Mr. Garcia's challenges and **AFFIRM** his sentence.